[No. S010775. Nov. 30, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LEE MASSIE, Defendant and Appellant.

556

## COUNSEL

Frederick D. Baker, under appointment by the Supreme Court, Kirk C. Jenkins and Sedgwick, Detert, Moran & Arnold for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Dane R. Gillette, Ronald S. Matthias, Gerald A. Engler and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—In 1979, defendant Robert Lee Massie pleaded guilty, against the advice of counsel, to the murder (Pen. Code, § 187)[1] and robbery (§ 211) of Boris Naumoff, and he admitted special circumstance allegations of prior murder (§ 190.2, subd. (a)(2)) and robbery murder (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)). He also pleaded guilty to the robbery (§ 211) of Yasphine Khashan and George Shatara, assault with a deadly weapon (§ 245) on Charles Harris, and four counts of possession of a concealable firearm by a convicted felon (§ 12021). After a penalty trial at which defendant waived his right to a jury and represented himself, the trial court set the penalty at death.

In 1985, this court reversed defendant's death sentence, the convictions for the robbery and murder of Naumoff, and the two special circumstances, holding that defendant's guilty pleas to the murder and robbery charges were invalid because they were made against the advice of counsel, in violation of section 1018. (*People* v. *Massie* (1985) 40 Cal.3d 620 [221 Cal.Rptr. 140, 709 P.2d 1309] (*Massie I*).) Section 1018 expressly prohibits a trial court from accepting a "plea of guilty of a felony for which the maximum sentence is death, or life imprisonment without the possibility of parole," when the plea is "without the consent of the defendant's counsel." At a retrial in which defendant was represented by counsel, a jury convicted defendant of the crimes against victim Naumoff and found true the two special circumstance allegations, and at the penalty phase the jury returned a verdict of death. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase—Prosecution's Case*

On the morning of January 3, 1979, defendant entered the Twin Peaks Grocery in San Francisco, looked around, and left without buying anything. A short time later, he returned to the store and again departed without

---

[1]Unless otherwise stated, all further statutory references are to the Penal Code.

making a purchase. When he did this a third time, store proprietor Grant Ridgeway followed defendant out of the store.[2] Defendant walked one block to a Chevrolet Vega automobile that was parked with the engine running, got in, and drove away. Ridgeway observed the car's license plate and, having nothing to write with, asked a woman in a nearby house to write it down for him. She wrote down "119 GL," omitting one of the letters that Ridgeway had asked her to write down. Ridgeway later gave the piece of paper with the partial license number to the police.

Around 1:45 that afternoon, Kenneth Ross was at the Miraloma Liquor Store, not far from the Twin Peaks Grocery, when defendant entered. Boris Naumoff, who had owned the store for about 30 years, asked defendant, "Can I help you?" Defendant replied, "I'm just looking." He left five minutes later. Ten minutes thereafter, Ross also left the store. He saw defendant standing outside, making nervous, jerky movements and looking up and down the street.

At 3:45 p.m., Sandy Bateman-Collins walked into the Miraloma Liquor Store. Store owner Naumoff was standing behind the counter. He was handing money to a man, but was dropping some of the money on the floor. As the man began to leave, Naumoff followed after him, mumbling, "A guy can't make a living any more." Bateman-Collins then heard three quick shots, followed a few seconds later by a fourth shot. She ducked behind a counter.

Just before the shooting, Charles Harris, who was scheduled to work at the Miraloma Liquor Store that evening, had entered the store and saw store owner Naumoff talking to a man who Harris assumed was a customer. Sensing nothing amiss, Harris walked toward the back room. Hearing a scuffle, he turned and saw Naumoff and the man face-to-face, with Naumoff holding the man in a bear hug. As Harris started to walk towards them, he heard three quick shots, followed by a fourth. He felt a pain in his leg, saw that the man was holding a gun, and ran to the back room.

Outside the Miraloma Liquor Store, 13-year-old Duffy Aceret saw a man run from the liquor store with a gun in his hand. At a lineup several days later, Aceret identified defendant as the man he had seen.

San Francisco police officers, called to the scene, found Naumoff's body on the floor of the Miraloma Liquor Store. He had been shot once in the right chest and twice in the heart. Dr. Boyd Stephens, chief medical examiner for the City of San Francisco, described the two shots to the heart as

---

[2] At the time of trial, Ridgeway was deceased. His previously given testimony was read to the jury.

"near contact wounds," meaning that they had been fired inches from their target.

That evening, Laura Garnett-Young saw a car stop outside her San Francisco home. A man got out of the car and looked around; he doffed his shirt and jacket, put them in her garbage can, and drove away. Garnett-Young wrote down the license number of the car (119 TGL) and gave it to the police. The police retrieved a bloodstained shirt and jacket from Garnett-Young's garbage can. The blood type matched that of victim Naumoff.

The next evening, around 10:00, San Francisco Police Officer Michael Pearson was on patrol with Officer Jeffrey Morlock when he saw a Chevrolet Vega automobile with a license number (119 TJL) that nearly matched the ones given to the police by store owner Grant Ridgeway and by Laura Garnett-Young. The car's headlights were off. Officers Pearson and Morlock followed the car for about five minutes while awaiting the arrival of backup officers; the car took an erratic route, often changing direction. Pearson and Morlock stopped the car and arrested defendant, the sole occupant. They found a loaded .357-caliber revolver in his waistband and a cocked and loaded .380-caliber automatic pistol in his coat pocket. According to ballistics expert Richard Grzybowski, the four bullets and the four spent casings that the police had found at the Miraloma Liquor Store were fired from the pistol found in defendant's pocket.

Officers Pearson and Morlock took defendant to the San Francisco Hall of Justice, where he was interviewed, shortly before midnight, by San Francisco Police Inspectors Frank Falzon and Herman Clark. Inspector Falzon advised defendant of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], and asked if he wanted to make a statement. Defendant replied that he wanted some time to think it over. Half an hour later, he agreed to speak to the officers. Defendant said that he went to the liquor store, pulled a gun, and told the man behind the counter, "It's a holdup." The man gave him $20 or $30 but attacked him as he was trying to leave, so defendant shot him. Defendant claimed that he had been drunk and under the influence of cocaine at the time.

B. *Guilt Phase—Defense Case*

Defendant testified in his own defense. He admitted killing store owner Naumoff but denied that the killing occurred during a robbery. After buying liquor and cigarettes from Naumoff, defendant discovered that Naumoff had shortchanged him by $30. He went back into the store and confronted Naumoff, who muttered under his breath but gave him the correct change.

As defendant started to leave the store, someone grabbed him in a bear hug and "slammed" him in the face. Defendant thought his attacker was a member of the Aryan Brotherhood, a prison gang. While struggling to escape, defendant pulled a pistol out of his jacket and fired without aiming. He acknowledged telling Inspectors Falzon and Clark that he had shot Naumoff during a robbery, but said he had done so only because he thought that if he told them what they wanted to hear, they would protect him from an attack by the Aryan Brotherhood by placing him in a separate cell.

To explain his fear of the Aryan Brotherhood, defendant offered evidence that while in prison he had been stabbed in the back in a gang-related assault possibly attributable to the Aryan Brotherhood, a dangerous gang that had killed many people. A former member of the Aryan Brotherhood testified that for years the gang had been trying to kill defendant, and prison officials testified that to protect defendant from gang attacks California prison authorities had transferred him at various times to Kansas, Nevada, and Washington to serve his sentence for a crime he had committed in California. Doctor Wesley Clark, a psychiatrist, explained that persons who have suffered violent trauma, such as the stabbing defendant had experienced in prison, often react with "hypervigilance" to situations that appear to be threatening; that is, they "become very agitated and violent."

To rebut defendant's testimony that the killing of store owner Naumoff did not occur during a robbery, the prosecution offered evidence that defendant had robbed two small markets in San Francisco not far from the store where Naumoff was killed. One of the robberies occurred the day before the Naumoff's murder and the other took place the morning of his death.

## C. *Prior Murder Special Circumstance*

The parties stipulated that defendant had suffered a prior conviction for murder in 1965.

## D. *Penalty Phase—Prosecution's Case*

Between January 7 and January 15, 1965, defendant committed a series of robberies and assaults in Los Angeles County. On the evening of January 7, Franklin Boller was getting out of his car in front of his home in West Covina when defendant approached him, hit him in the mouth with a rifle, and demanded money. Boller gave defendant his wallet and coin purse. Defendant then fired a shot at Boller, grazing the side of his head.

Later that evening, Morris and Mildred Weiss were returning to their San Gabriel home. As Mildred got out of the car, defendant approached and fatally shot her. He then jumped into a waiting car and sped away.

Just before 12 o'clock that same night, defendant entered a bar in Baldwin Park, brandished a rifle, and said, "This is a stickup." He took money from the cash register and the wallets of the bartender and patron Archie Bolivar. The bartender threw a beer bottle at defendant, who fled.

On January 15, 1965, defendant encountered Frank Patti at MacArthur Park in Los Angeles. The two of them agreed to go to Patti's hotel room. There, defendant pulled a revolver, demanded money, and told Patti to take his clothes off. Patti attacked defendant, who fired three shots and fled. Two shots hit Patti in the stomach and the third grazed his neck.

Defendant was arrested on January 20, 1965, for the assault on Patti. He gave two tape-recorded statements in which he admitted committing all of the crimes described above and said he was trying to rob Mildred Weiss when he shot and killed her. He was convicted of four counts of robbery, one count of attempted murder, and one count of murder.

### E. *Penalty Phase—Defense Case*

Defendant was born in Virginia to a 15-year-old woman and a man who had married her only to avoid a charge of statutory rape. Between his birth and his 11th birthday, defendant had been placed with 5 different foster parents, at times living with his mother or his grandparents. At one foster home, he was disciplined by getting whipped with switches and having his head held under water. Between the ages of four and six, he was living with his mother, who took him barhopping; his stepfather physically abused him.

At the age of 11, defendant was sent to the Beaumont School for truant and runaway boys in Virginia. Boys who misbehaved were whipped up to 40 times with a thick leather belt.

At the age of 17, defendant stole a car and was sentenced to adult prison, where he was gang-raped by 4 older inmates. Because of this experience, defendant feigned insanity, resulting in commitment to a prison psychiatric facility.

Various witnesses described defendant as having become a religious man who felt remorse for killing store owner Naumoff. While serving his sentence for the 1965 murder of Mildred Weiss, defendant had been an exemplary prisoner who cooperated with staff, performed valuable clerical services, got along well with other prisoners, and acted as a peacemaker to ease tensions among inmates.

## II. Discussion

### A. *Double Jeopardy*

Defendant contends that because the appeal from his initial conviction and death sentence in this case was taken automatically and over his opposition, and because he filed a petition for rehearing challenging this court's reversal of his conviction and death sentence, double jeopardy principles barred the prosecution from retrying him. A summary of the pertinent facts follows.

As explained at the outset, defendant initially entered (against his attorney's advice) a plea of guilty to the charge of capital murder and was thereafter sentenced to death. His death judgment was automatically appealed to this court, under subdivision (b) of section 1239 (hereafter section 1239(b)).

Defendant asked this court not to appoint counsel to pursue the automatic appeal and to dismiss it, arguing that under the state and federal Constitutions he had a right to waive the automatic appeal. When we refused to do so, defendant petitioned for a writ of habeas corpus in the federal district court; he sought self-representation and dismissal of the appeal. The court denied the writ, and defendant appealed. The United States Court of Appeals for the Ninth Circuit upheld the district court's ruling, holding that section 1239(b), which bars a defendant who is sentenced to death from waiving an appeal, does not violate the federal Constitution. (*Massie* v. *Sumner* (9th Cir. 1980) 624 F.2d 72, cert. den. (1981) 449 U.S. 1103 [101 S.Ct. 899, 66 L.Ed.2d 828].)

We then reversed defendant's conviction and death sentence, holding that defendant's plea of guilty was invalid because California law (§ 1018) does not permit a defendant in a capital case to enter a plea of guilty against the advice of counsel. (*Massie I, supra*, 40 Cal.3d 620.) Defendant sought a rehearing, asking us to reinstate his conviction and death sentence, and asserting that to retry him would violate the constitutional prohibition against double jeopardy. We denied the petition for rehearing.

When the prosecution attempted to retry defendant for the murder of store owner Naumoff, defendant entered a plea of "[o]nce in jeopardy" (§ 1016, subd. 5), contending that he had been placed in jeopardy when he was first convicted of capital murder, that this court had reversed his conviction over his objection, and that therefore the state and federal prohibitions against double jeopardy barred the state from again prosecuting him for the same offense. When the trial court rejected defendant's double jeopardy claim, he

raised the issue in a petition for writ of habeas corpus in the federal district court. The court denied the writ; the denial was affirmed on appeal. (*Massie v. Hennessey* (9th Cir. 1989) 875 F.2d 1386, cert. den. (1990) 494 U.S. 1039 [110 S.Ct. 1504, 108 L.Ed.2d 639].)

### 1. *Federal constitutional claim*

■ The Fifth Amendment to the federal Constitution provides: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." The double jeopardy clause protects criminal defendants in three ways: " 'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' " (*Schiro* v. *Farley* (1994) 510 U.S. 222, 229 [114 S.Ct. 783, 789, 127 L.Ed.2d 47], quoting *North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [89 S.Ct. 2072, 2076, 23 L.Ed.2d 656].) The second of these protections—the bar against a second prosecution for the same offense after conviction—is at issue here.

As defendant points out, "the language of the Double Jeopardy Clause protects against more than the actual imposition of two punishments for the same offense; by its terms, it protects a criminal defendant from being *twice put into jeopardy* for such punishment. [Citation.] That is, the Double Jeopardy Clause 'prohibits merely punishing twice or *attempting a second time to punish criminally*, for the same offense.' [Citation.]" (*Witte* v. *United States* (1995) 515 U.S. 389, 396 [115 S.Ct. 2199, 2204, 132 L.Ed.2d 351], original italics.) ■ Defendant contends that by seeking to retry him for murder after reversal of his conviction, which was based on a plea of guilty, the prosecution was for the second time trying to punish him criminally for the same offense. But, as the Attorney General points out, here defendant was not placed in jeopardy when he initially entered his plea of guilty to the charge of murder with special circumstances, because the plea was invalid. As we mentioned earlier, California law does not allow a capital defendant to plead guilty against the advice of counsel, as occurred here. (*Massie I, supra*, 40 Cal.3d at p. 625.)

Ordinarily, jeopardy attaches when a defendant enters a plea of guilty, or when the court imposes sentence following the entry of that plea. (See, e.g., *Dawson* v. *U.S.* (7th Cir. 1996) 77 F.3d 180, 182; *U.S.* v. *Faber* (9th Cir. 1995) 57 F.3d 873, 875; *U.S.* v. *Santiago Soto* (1st Cir. 1987) 825 F.2d 616, 618-619; *U.S.* v. *Felton* (3d Cir. 1985) 753 F.2d 276, 278; *United States* v.

*Cambindo Valencia* (2d Cir. 1979) 609 F.2d 603, 637.)[3] Jeopardy does not attach when the plea is invalid, however. "[A]n unlawful guilty plea is null and therefore does not bar a second prosecution for the same offense. Thus, if a court lacks jurisdiction to accept defendant's plea or if the plea violates any statute, then the plea and sentence will not bar reprosecution." (22 C.J.S. (rev. 1989) Criminal Law, § 223, p. 272, fn. omitted.) We know of no authority to the contrary. The cases that defendant has cited are not on point, for none involved a void plea of guilty.

This case is analogous to *Cox* v. *State* (Fla. 1982) 412 So.2d 354. There, the trial court, over the prosecutor's objection, accepted a defendant's plea of guilty to a lesser offense included within the crime charged. On an appeal by the prosecution, the Florida Supreme Court invalidated the guilty plea, holding that under Florida law the trial court could not accept such a plea without the prosecutor's consent. The court also held that because the guilty plea was invalid, jeopardy had not attached, and the state could again prosecute the defendant without violating the federal Constitution's prohibition against double jeopardy. (*Id.* at pp. 355-356; see also *Bayless* v. *United States* (8th Cir. 1945) 147 F.2d 169, 170.) Here, too, as explained earlier, defendant's guilty plea was invalid. Thus, as in *Cox*, jeopardy did not attach upon entry of the invalid guilty plea. Therefore, the prosecution could try defendant for the murder of store owner Naumoff.

Defendant insists that the trial court did have the power to accept his plea of guilty to the charge of capital murder. He asserts that section 1018, which bars a trial court from accepting a guilty plea in a capital case over the advice of counsel, "is unconstitutional as a violation of the Sixth Amendment right to control one's own defense, the Fourteenth Amendment's Equal Protection clause, and their respective California law counterparts." We rejected this contention in *People* v. *Chadd* (1981) 28 Cal.3d 739, 747-754 [170 Cal.Rptr. 798, 621 P.2d 837], and we see no reason to reconsider the issue. Defendant also maintains that in his earlier appeal, *Massie I, supra*, 40 Cal.3d 620, we should have found section 1018 inapplicable because his trial counsel consented in court to the plea of guilty, even though the plea was against counsel's advice. We rejected that contention in *Massie I*, and we do not reconsider it here.

### 2. *State constitutional and statutory claims*

Defendant further contends that by retrying him for Naumoff's murder, the state also violated the prohibitions against double jeopardy contained in

---

[3]As defendant observes, the federal courts are not in agreement as to whether jeopardy attaches when the guilty plea is accepted by the court, or when sentence is imposed following the entry of that plea. We express no views on the merits of that debate.

the state Constitution and statutory provisions. As he points out, article I, section 15 of the state Constitution provides, "Persons may not twice be put in jeopardy for the same offense." The California Penal Code contains similar provisions. (See §§ 687 ["No person can be subjected to a second prosecution for a public offense for which he has once been prosecuted and convicted or acquitted."], 1023 ["When the defendant is convicted or acquitted or has been once placed in jeopardy upon an accusatory pleading, the conviction, acquittal, or jeopardy is a bar to another prosecution for the offense charged in such accusatory pleading . . . ."].)

As discussed earlier, when, as in this case, a defendant has entered an invalid guilty plea, the federal Constitution does not bar a second prosecution. We see no reason why a similar rule should not apply to the double jeopardy prohibitions contained in the state's Penal Code and Constitution. As a leading treatise on California law has pointed out: "Where a guilty plea is properly vacated, *whether on the defendant's motion or otherwise*, the double jeopardy prohibition does not prevent a trial on the offense charged." (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 302, p. 348, italics added; see also *People* v. *Clark* (1968) 264 Cal.App.2d 44, 47 [70 Cal.Rptr. 324] ["In our view double jeopardy no more follows the vacation of an erroneously accepted plea than it does an instance of mistaken identity, incompetency, corruption, or mistrial."].)

### 3. *Jurisdiction to hear appeal in Massie I, supra, 40 Cal.3d 620*

Defendant contends that following our reversal of his convictions and death sentence in *Massie I, supra,* 40 Cal.3d 620, the prosecution was precluded from further prosecuting him for the same capital murder. He asserts that we were "without authority" to hear the appeal of his 1979 guilty plea and death sentence, and that therefore the subsequent trial violated the bar against double jeopardy. He presents five bases for this contention: (1) This court should have honored his request to waive the appeal; (2) the appeal was barred because his counsel failed to obtain a certificate of probable cause; (3) by entertaining the appeal, this court violated defendant's constitutional rights to control his defense, to due process, and to equal protection of the law; (4) the appeal was barred by the rule against advisory opinions; and (5) by entertaining the appeal, this court created an irreconcilable ethical conflict for the attorney appointed to represent defendant on appeal.

It is difficult to see how this argument could benefit defendant. If we were to decide here that in *Massie I, supra*, 40 Cal.3d 620, we should have honored defendant's request to dismiss the automatic appeal, the guilty plea

that formed the basis for the robbery and capital murder convictions in that case would still be invalid because, as explained earlier, the plea was impermissible under California law and therefore the trial court lacked the power to accept it. Moreover, even if that guilty plea were to be reinstated, so would defendant's sentence of death. In any event, we conclude that this court had the power to set aside the robbery and murder convictions arising from defendant's 1979 plea of guilty.

### a. *Defendant's request to waive his appeal*

 Defendant faults this court for not allowing him to waive the automatic appeal in *Massie I, supra*, 40 Cal.3d 620, following his guilty plea to capital murder. He acknowledges that we rejected an identical contention in *People* v. *Stanworth* (1969) 71 Cal.2d 820 [80 Cal.Rptr. 49, 457 P.2d 889]. He argues, however, that *Stanworth* was wrong and should be overruled. We disagree.

Section 1239(b) provides that an appeal of a sentence of death "is automatically taken" to this court. As we explained in *Stanworth*: This statute "imposes a duty upon this court 'to make an examination of the complete record of the proceedings had in the trial court, to the end that it be ascertained whether defendant was given a fair trial.' . . . [¶] . . . We cannot avoid or abdicate this duty merely because defendant desires to waive the right provided for him." (*People* v. *Stanworth, supra*, 71 Cal.2d at p. 833.)

In taking a contrary view, defendant argues that the Legislature never intended to prevent capital defendants from waiving the right to an appeal. In support, he cites to a legislative committee report issued in 1935. This report was not discussed in *People* v. *Stanworth, supra*, 71 Cal.2d 820, and defendant asks us to take judicial notice of it. We do so.[4]

In 1935, condemned inmate Rush Griffin was executed before his appeal had been heard. Griffin's attorney had filed a notice of appeal in the superior

---

[4]At defendant's request, we take judicial notice of legislative history relating to the 1935 amendment to section 1239(b); of legislative history relating to the passage in 1965 of section 1237.5, requiring defendants who appeal following a plea of guilty to obtain a certificate of probable cause (see pt. II.A.3.b., *post*); and of the unpublished federal district court decision in *Massie* v. *Sumner* (N.D.Cal. Oct. 3, 1979, Docket No. C-79-1660) rejecting defendant's attempt to secure dismissal of the automatic appeal of his death sentence arising from his guilty plea. The materials are appropriate subjects of judicial notice. (See generally, *Planning & Conservation League* v. *Department of Water Resources* (1998) 17 Cal.4th 264, 271, fn. 4 [70 Cal.Rptr.2d 635, 949 P.2d 488]; *People* v. *Eubanks* (1996) 14 Cal.4th 580, 591, fn. 3 [59 Cal.Rptr.2d 200, 927 P.2d 310].) We deny, however, defendant's request that we take judicial notice of a series of newspaper articles describing the 1935 execution of condemned inmate Rush Griffin while his appeal was pending and the ensuing proposals to require automatic appeals of death sentences. Nor do we take judicial notice of an excerpt from a document

court, but the clerk's transcript of the trial proceedings was not forwarded to this court until three days *after* Griffin's execution. At that time, it was customary for the clerk of this court to notify the warden of San Quentin prison by letter that an appeal was pending, but because the superior court had not informed this court that the defendant had appealed, no such letter was written. The superior court sent the warden a letter mentioning the appeal, but the warden overlooked the letter and carried out Griffin's execution. (Special Com. to Investigate the Execution of Rush Griffin, Rep. (May 28, 1935) Sen. J. (1935 Reg. Sess.) p. 2427 (hereafter Special Committee Report).)

The special legislative committee that looked into the matter concluded that "the existing procedures of law are woefully inadequate with reference to the procedure for appeal of cases involving the death penalty." (Special Com. Rep., *supra*, p. 2428.) The committee recommended that legislation be enacted providing, among other things, for "an automatic appeal . . . in all cases in which the penalty of death is imposed" and that "the date of execution be set by the trial judge upon the receipt by him of the Appellate Court's order affirming the death penalty, and not as now provided when sentence is pronounced by the trial judge." (*Ibid.*) Legislation to so amend section 1239 was introduced in the state Senate on May 28, 1935, the same day on which the Special Committee Report was recorded in the Senate Journal. Both the Senate and the Assembly swiftly approved the proposed amendment; seven weeks later, the Governor signed it into law.

The holding in *People* v. *Stanworth, supra,* 71 Cal.2d 820, that a capital defendant may not waive the automatic appeal provided by section 1239(b) is consistent with the legislative purpose reflected in the Special Committee Report just discussed. To prevent an execution *before* determination of an appeal, the committee recommended that legislation be enacted requiring that "*all cases* in which the death penalty is imposed" be automatically appealed to this court. (Special Com. Rep., *supra*, p. 2428, italics added.) Section 1239(b), which expressly provides for an automatic appeal in every capital case, implements this recommendation. If, as defendant contends, the Legislature's intent was to permit a condemned inmate to waive an appeal to a death judgment, it could easily have said so. It did not.

We decided *People* v. *Stanworth, supra,* 71 Cal.2d 820, almost 30 years ago. Since then, the Legislature has reenacted section 1239 (Stats. 1982, ch.

---

entitled Review of Selected 1965 Code Legislation, a publication of California Continuing Education of the Bar, discussing an amendment to section 1237.5. (See generally, *People* v. *Ramos* (1997) 15 Cal.4th 1133, 1167 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *Mangini* v. *R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063-1065 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

917, § 4, p. 3355) and has amended it on two other occasions (Stats. 1975, ch. 1125, § 3, p. 2744; Stats. 1988, ch. 551, § 1, p. 2013), but it has never altered section 1239's requirement that "[w]hen . . . a judgment of death is rendered, an appeal is automatically taken by the defendant." The quoted phrase forms the basis for *Stanworth*'s holding that an appeal of a judgment of death may not be waived. " 'When a statute has been construed by the courts, and the Legislature thereafter reenacts that statute without changing the interpretation put on that statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that statute.' " (*People* v. *Ledesma* (1997) 16 Cal.4th 90, 100-101 [65 Cal.Rptr.2d 610, 939 P.2d 1310]; see also *Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 235 [5 Cal.Rptr.2d 782, 825 P.2d 767] ["In the absence of legislative history suggesting otherwise, there is a very strong presumption that the Legislature intends that the same construction be given statutory language which has been readopted without change."].)

> b. *Requirement of a certificate of probable cause following a guilty plea*

■ Defendant contends that this court lacked jurisdiction to hear his 1979 automatic appeal in *Massie I, supra*, 40 Cal.3d 620, because it arose from a plea of guilty and the trial court did not issue a certificate of probable cause as, defendant contends, is required under section 1237.5.

Section 1237.5 requires a defendant to obtain from the trial court a certificate of probable cause when appealing from a conviction resulting from a plea of guilty. In 1979, when defendant entered his plea of guilty in this case, section 1237.5 provided in relevant part: "No appeal shall be taken by [a] defendant from a judgment of conviction upon a plea of guilty or nolo contendere . . . except where: [¶] (a) The defendant has filed with the trial court a *written statement*, executed under oath or penalty of perjury[,] showing reasonable . . . grounds going to the legality of the proceedings; and [¶] (b) The trial court has executed and filed a certificate of probable cause for such appeal with the county clerk." (Italics added.) Defendant points out that he did not file with the trial court the requisite written statement and the trial court did not issue a certificate of probable cause. Accordingly, he argues, this court lacked jurisdiction to entertain his appeal in *Massie I, supra*, 40 Cal.3d 620.

Defendant acknowledges that to require a defendant sentenced to death to obtain a certificate of probable cause would be inconsistent with section 1239(b), which, as previously explained, provides that a judgment of death results in an automatic appeal "without *any action* by [the defendant] or his

. . . counsel." (Italics added.) Defendant argues, however, that because section 1237.5's "certificate of probable cause" requirement was enacted more recently than section 1239(b)'s automatic appeal provision, section 1237.5 controls. He invokes the principle of statutory construction that "in the event of a conflict between two statutes, effect will be given to the more recently enacted law." (*Bledstein* v. *Superior Court* (1984) 162 Cal.App.3d 152, 160 [208 Cal.Rptr. 428].) Principles of statutory construction guide us in achieving our ultimate task, which is to ascertain the Legislature's intent. (*People* v. *Fuhrman* (1997) 16 Cal.4th 930, 937 [67 Cal.Rptr.2d 1, 941 P.2d 1189].) As we explain below, after examining the purpose of section 1237.5 we conclude that the Legislature did not intend that provision to apply to appeals from judgments of death based on a plea of guilty.

"The purpose for requiring a certificate of probable cause is to discourage and weed out frivolous or vexatious appeals challenging convictions following guilty and nolo contendere pleas. [Citations.] The objective is to promote judicial economy 'by screening out wholly frivolous guilty [and nolo contendere] plea appeals before time and money is spent preparing the record and the briefs for consideration by the reviewing court.' [Citations.]" (*People* v. *Panizzon* (1996) 13 Cal.4th 68, 75-76 [51 Cal.Rptr.2d 851, 913 P.2d 1061].) This goal is inapplicable to an appeal from a sentence of death because, as we have explained, the Legislature has imposed on this court a duty to examine the record in *all* death sentence cases to determine whether the proceedings leading to the conviction and sentence were conducted fairly. (*People* v. *Stanworth, supra,* 71 Cal.2d at p. 833.) We therefore reject defendant's contention that in enacting section 1237.5, which generally requires a certificate of probable cause in cases involving a plea of guilty or nolo contendere, the Legislature intended that requirement also to apply to automatic appeals in capital cases.

 c. *Alleged violation of defendant's state and federal constitutional rights*

 ■ Defendant contends that if, as we held in *People* v. *Stanworth, supra,* 71 Cal.2d at pages 832-834, section 1239(b) bars this court from dismissing, even at a defendant's request, an automatic appeal from a judgment of death, it is unconstitutional because it violates a defendant's "right to control his defense." He asserts that this right arises from the provisions of the state and federal Constitutions entitling a criminal defendant to the assistance of counsel. (U.S. Const., Amend. VI; Cal. Const., art. I, § 15.)

 Defendant relies primarily on *Faretta* v. *California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562], which holds that a criminal defendant has

the right of self-representation at trial. But, as we noted in *Massie I*, " '*Faretta* does not purport . . .' . . . to abrogate the rule . . . that a capital defendant has no right to waive his automatic appeal." (*Massie I, supra*, 40 Cal.3d at p. 624.)

Defendant points to isolated comments in federal cases that were decided after our decision in *Massie I* and state that a defendant has the right to decide whether to appeal. (See *Jones* v. *Barnes* (1983) 463 U.S. 745, 751 [103 S.Ct. 3308, 3312, 77 L.Ed.2d 987] ["[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his own behalf, or *take an appeal* . . . ." (Italics added.)]; *Marrow* v. *United States* (9th Cir. 1985) 772 F.2d 525, 530 ["The decision whether to appeal 'must be the defendant's own choice,' . . . even after a guilty plea . . . ."].) We do not view these passing remarks, taken out of the context in which they arose in noncapital cases, as establishing a rule that a capital defendant who has been sentenced to death has a constitutional right to waive an automatic appeal.

Defendant relies on a series of recent cases in which we have held that at trial a capital defendant may elect self-representation and present no mitigating evidence on his own behalf, notwithstanding California's interest in assuring a "reliable" penalty determination in capital cases. (See *People* v. *Bradford* (1997) 15 Cal.4th 1229, 1363-1373 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People* v. *Stansbury* (1993) 4 Cal.4th 1017, 1062-1064 [17 Cal.Rptr.2d 174, 846 P.2d 756]; *People* v. *Diaz* (1992) 3 Cal.4th 495, 566 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People* v. *Howard* (1992) 1 Cal.4th 1132 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 809-811 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1029-1030 [264 Cal.Rptr. 386, 782 P.2d 627].) These cases, he argues, demonstrate that the state's interest in the reliability of a capital trial does not "outweigh" a defendant's right to control the defense. No weighing, however, is required. *Faretta* v. *California, supra*, 422 U.S. 806, does not grant defendants the right to "control" their *appeals*, either by electing self-representation (*People* v. *Scott* (1998) 64 Cal.App.4th 550 [75 Cal.Rptr.2d 315] [no right of self-representation on appeal]; *In re Walker* (1976) 56 Cal.App.3d 225, 228-229 [128 Cal.Rptr. 291] [same]), by electing which issues to raise (see *People* v. *Clark* (1992) 3 Cal.4th 41, 173 [10 Cal.Rptr.2d 554, 833 P.2d 561] [court will not accept in propria persona filings in automatic appeal]), or (as urged by defendant) by waiving an automatic appeal.

Defendant further contends that section 1239(b), which prohibits this court from granting requests by defendants sentenced to death to dismiss

their automatic appeals, violates his right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution. We disagree. As we have explained, "the first prerequisite to such a claim is a showing that 'the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' " (*People* v. *Andrews* (1989) 49 Cal.3d 200, 223 [260 Cal.Rptr. 583, 776 P.2d 285], quoting *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549], italics omitted.) Section 1239(b) applies to individuals who, like defendant, have been sentenced to death. Defendant fails to identify any other similarly situated group that is affected differently by section 1239(b).

### d. *Rule against advisory opinions*

■ Defendant argues that because the automatic appeal in *Massie I, supra*, 40 Cal.3d 620, was taken against his wish, it did not present a case or controversy ripe for decision and therefore, lacking the power to render advisory opinions, we could not consider the appeal. He relies on *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273, 284 [10 Cal.Rptr.2d 859, 834 P.2d 119], in which we reiterated the "well-established rule" that we should "avoid advisory opinions." Our decision in *Massie I, supra*, 40 Cal.3d 620, however, was not an advisory opinion, because its effects were real, not theoretical: it reversed defendant's robbery and murder convictions as well as his sentence of death.

Moreover, our *policy* against advisory opinions does not deprive us of the *power* to hear an appeal notwithstanding the appealing party's request that it be dismissed. There is a " 'well-established line of judicial authority recognizing an exception to the mootness doctrine, and permitting the court to decline to dismiss a case rendered moot by stipulation of the parties where the appeal raises issues of continuing public importance.' " (*State of Cal.* ex rel. *State Lands Com.* v. *Superior Court* (1995) 11 Cal.4th 50, 61 [44 Cal.Rptr.2d 399, 900 P.2d 648].) Defendant's convictions and death sentence were properly before us in *Massie I, supra*, 40 Cal.3d 620, because they came within the automatic appeal provision of section 1239(b). We therefore had the power to hear the appeal notwithstanding defendant's request to dismiss it.

### e. *Alleged conflict of interest*

■ Defendant asserts that, by prohibiting a condemned inmate from waiving an automatic appeal, section 1239(b) creates "an irreconcilable ethical conflict for defendant's appointed counsel." He points to the ethical

duty of an attorney to follow the client's wishes regarding the objectives of the representation. (See ABA Model Rules Prof. Conduct, rule 1.2(a) ["A lawyer shall abide by a client's decisions concerning the objectives of the representation."].) When a condemned inmate wishes to give up the right to an automatic appeal, defendant argues, section 1239(b) places the defense attorney in an impossible situation. As appellate counsel, the attorney is obligated to seek out grounds for reversal. (See generally, *In re Smith* (1970) 3 Cal.3d 192, 197 [90 Cal.Rptr. 1, 474 P.2d 969]; *People* v. *Feggans* (1967) 67 Cal.2d 444, 447 [62 Cal.Rptr. 419, 432 P.2d 21].) Yet the attorney is also under an ethical duty to abide by the client's wish to seek dismissal of the appeal, thus resulting in the affirmance of the conviction and the sentence of death. As defendant puts it: "To require that the attorney serve two masters, both the client and the state's abstract interest in avoiding the arbitrary and capricious imposition of the death penalty, is to deprive the capital defendant of his Sixth Amendment right to counsel unfettered by conflicts of interest."

We find no conflict of interest. It is true that an attorney "must always respect and defer to those decisions properly reserved to his client." (*Davis* v. *State Bar* (1983) 33 Cal.3d 231, 238 [188 Cal.Rptr. 441, 655 P.2d 1276].) But a defendant sentenced to death is not free to decide whether or not to appeal, because the Legislature has decreed that there be an *automatic* appeal in every capital case (§ 1239(b)), which cannot be waived. Contrary to defendant's assertion, defense counsel has no ethical obligation to comply with a capital defendant's request to abandon the appeal, for to do so is, as just explained, not permitted.

### 4. *Double jeopardy effect of defendant's robbery conviction in Massie I, supra, 40 Cal.3d 620*

At the time of his initial trial in 1979, defendant pleaded guilty to the robbery and murder of store owner Naumoff. On defendant's automatic appeal, this court held that *both* guilty pleas were invalid and reversed *both* convictions. We reasoned that defendant was not permitted to plead guilty to the robbery charge against the advice of his attorney because, under the felony-murder rule, the elements of the *robbery* charge were essential elements of the *murder* for which defendant was sentenced to death. We pointed out that unless we reversed the robbery conviction, that conviction " 'would be conclusive on retrial of the murder count and the prosecution would need only prove the fact of the killing in its perpetration in order to obtain a new conviction of first degree murder.' " (*Massie I, supra*, 40 Cal.3d at p. 625, quoting *People* v. *Chadd, supra*, 28 Cal.3d at p. 755; *People* v. *Ballentine* (1952) 39 Cal.2d 193, 197 [246 P.2d 35].)

Defendant contends that his trial for *murder*, following his plea of guilty to *robbery* (*Massie I, supra*, 40 Cal.3d 620), impermissibly placed him in

double jeopardy. He points out that the murder and the robbery of Naumoff were the "same offense" for double jeopardy purposes, because, to establish defendant's guilt of murder under the felony-murder rule, the prosecution had to prove defendant's commission of the robbery. (See *United States* v. *Dixon* (1993) 509 U.S. 688, 698 [113 S.Ct. 2849, 2875, 125 L.Ed.2d 556] ["[F]or double jeopardy purposes, 'the crime generally described as felony murder' is not 'a separate offense distinct from its various elements.' "]; *Harris* v. *Oklahoma* (1977) 433 U.S. 682 [97 S.Ct. 2912, 53 L.Ed.2d 1054] [double jeopardy clause barred robbery prosecution of a defendant previously tried for felony murder based on the same robbery].) ■■■ But, as explained in parts II.A.1 and II.A.2, *ante*, jeopardy does not attach to an invalid plea of guilty. Defendant's guilty plea to robbery, which, under the felony-murder rule, relieved the prosecution from having to prove some of the elements of the capital murder with which defendant was also charged, was invalid because the plea was entered against defense counsel's advice. As we mentioned earlier, California law prohibits such a plea in a capital case. (§ 1018.) Accordingly, there is no merit to defendant's claim that his trial violated the constitutional prohibition against double jeopardy.

■■■ Defendant also argues that section 1239(b)'s automatic appeal provision pertains only to his murder conviction, not to convictions for other crimes charged in the same accusatory pleading. He asserts that in *Massie I, supra*, 40 Cal.3d 620, we lacked jurisdiction to reverse his robbery conviction and that therefore the trial of the murder, the "same offense" as the robbery for double jeopardy purposes (*United States* v. *Dixon, supra*, 509 U.S. at p. 698 [113 S.Ct. at p. 2857]), violated the prohibition against double jeopardy.

Assuming for the sake of argument that the doctrine of law of the case does not dispose of this contention,[5] we find it to be without merit. At the time of defendant's 1979 convictions for robbery and capital murder, section

---

[5] " 'The doctrine of the law of the case is this: That where, upon an appeal, the supreme court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, and, as here assumed, in any subsequent suit for the same cause of action, and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' " (*People* v. *Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211], quoting *Tally* v. *Ganahl* (1907) 151 Cal. 418, 421 [90 P. 1049]; see also *People* v. *Ramos, supra*, 15 Cal.4th at p. 1161.) Here, defendant challenges a principle of law necessary to the decision of this court in his previous appeal, a situation ordinarily covered by the doctrine of law of the case. Our cases do not state, however, whether the doctrine may be applied against a defendant who, as in this case, was an unwilling participant in the previous appeal. We therefore assume for the sake of argument that the doctrine is inapplicable and address defendant's claim on its merits.

1239(b) provided: "When upon any plea a judgment of death is rendered, an appeal is automatically taken by the defendant without any action by him or his counsel." Nothing in that language limits the scope of a defendant's automatic appeal to the crime or crimes for which the defendant was sentenced to death. We therefore construe that provision as requiring an automatic appeal to this court of the *entire* judgment, thus including convictions for noncapital as well as capital crimes.

### B. *Cruel and Unusual Punishment*

■ Defendant contends that to execute him after more than 16 years of confinement on death row would be cruel and unusual punishment, in violation of the Eighth Amendment to the federal Constitution. He notes that two justices of the United States Supreme Court have taken the view that "the importance and novelty of the question . . . are sufficient to warrant review" by that court. (*Lackey* v. *Texas* (1995) 514 U.S. 1045 [115 S.Ct. 1421, 131 L.Ed. 304] (mem. opn. of Stevens, J., on denial of cert.; accord, Breyer, J.).)

We rejected a similar claim in *People* v. *Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984]. (See also *People* v. *Frye* (1998) 18 Cal.4th 894, 1030-1031 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Defendant, however, insists that in *Hill* we considered only whether the delay itself amounted to cruel and unusual punishment, whereas his argument raises a slightly different point: that the cruel and unusual punishment arises from the execution that occurs after the delay. Defendant misconstrues *Hill*, which held that the delay inherent in the automatic appeal process "is not a basis for finding that either *the death penalty itself* or the process leading to it is cruel and unusual punishment." (*People* v. *Hill, supra,* 3 Cal.4th at p. 1016, italics added.) Defendant also maintains that his case is distinguishable from *Hill* because he, unlike the defendant in *Hill*, made every possible effort to block consideration of his initial appeal and thus to speed up the appellate process. Our decision in *Hill*, however, was not based on the defendant's failure to ask for dismissal of his appeal. Rather, we concluded that substantial delay in the execution of a sentence of death is inherent in this state's automatic appeal process, but that this delay is a "constitutional safeguard," not a "constitutional defect." (*Id.* at p. 1014.) An execution following such delay is not cruel and unusual punishment. Our decision in *Hill* compels us to reject defendant's claim of cruel and unusual punishment in this case.

### C. *Admission of Defendant's Confession*

Before trial, defendant moved to suppress his tape-recorded confession to the murder of store owner Naumoff. The trial court denied the motion. At the suppression hearing the following testimony was presented.

Defendant was arrested around 10:00 p.m. on January 4, 1979, the day after Naumoff's murder. The arresting officers took him to the police station in the San Francisco Hall of Justice. In an interview room, Homicide Inspector Frank Falzon, in the presence of Inspector Herman Clark, advised defendant of his rights under *Miranda* v. *Arizona, supra*, 384 U.S. 436, and asked if defendant wished to make a statement. According to Falzon, defendant replied that his "head wasn't clear"; he wanted food and some time to think about whether he wanted to make a statement. The officers gave defendant coffee and a sandwich. They told him that if he would not consent to a search of his car and his residence, they would seek a search warrant. Defendant then gave a written consent to the search.

The officers then left defendant alone in the interview room for 20 to 40 minutes. When they returned, defendant said he would talk to them.

Inspector Falzon turned on a tape recorder. He again read defendant his *Miranda* rights and again asked if defendant wanted to make a statement. Defendant responded, "I will talk to you only on one condition." He then explained that people within the prison system were trying to kill him, and that he feared for his safety. He therefore wanted to be housed in a separate jail cell. Inspector Falzon replied, "I believe that can be accommodated for you sir." When defendant insisted on a "guarantee" of a single cell, Falzon said that he and Inspector Clark did not run the jail, but that they would tell the sheriff that defendant's life was in danger, and that they would "do everything within [their] power" to get defendant a separate cell. Defendant then asked, "Will you also not publish what I'm saying to you now?" Falzon replied that defendant's statement would not be made public before defendant's trial, but that the tape recording would probably be played at the trial. Defendant then agreed to talk to the officers. He admitted shooting store owner Naumoff after robbing him. Defendant concluded his statement by saying that he had agreed freely and voluntarily to talk to the officers.

At the suppression hearing, however, defendant claimed that he had falsely confessed to Inspectors Falzon and Clark because they "intimidated or threatened" him. He said that Inspector Clark told him, before the tape recorder was turned on, that it was in defendant's "best interest" to talk to the police. According to defendant, Clark said that defendant needed to be placed in protective custody for his safety, and that if defendant refused to speak to the officers he "wasn't going to get the protective custody." Testifying in rebuttal, Inspector Clark denied making these statements.

■ For reasons given below, we reject defendant's contention that his confession was involuntary because it was induced by promises of leniency, and that it therefore should have been suppressed.

■ The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession. (*People* v. *Jones* (1998) 17 Cal.4th 279, 296 [70 Cal.Rptr.2d 793, 949 P.2d 890].) The federal Constitution requires the prosecution to establish, by a preponderance of the evidence, that a defendant's confession was voluntary. (*Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [92 S.Ct. 619, 626-627, 30 L.Ed.2d 618].) The same is now true under California law as a result of an amendment to the state Constitution enacted as part of Proposition 8, a 1982 voter initiative. (See Cal. Const., art. I, § 28, subd. (d); *People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].) At the time of the murder here, however, state law required the prosecution to establish the voluntariness of a confession beyond a reasonable doubt. (*People* v. *Memro* (1995) 11 Cal.4th 786, 826 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) That law therefore governs this case.

Under both state and federal law, courts apply a "totality of circumstances" test to determine the voluntariness of a confession. (*Withrow* v. *Williams* (1993) 507 U.S. 680, 693-694 [113 S.Ct. 1745, 1753-1755, 123 L.Ed.2d 407]; *People* v. *Williams* (1997) 16 Cal.4th 635, 660 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Among the factors to be considered are " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " (*People* v. *Williams, supra*, 16 Cal.4th at p. 660.) On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. (*People* v. *Jones, supra*, 17 Cal.4th 279; *People* v. *Memro, supra*, 11 Cal.4th at p. 826.) In determining whether a confession was voluntary, "[t]he question is whether defendant's choice to confess was not 'essentially free' because his will was overborne." (*People* v. *Memro, supra*, 11 Cal.4th at p. 827.)

■ After an independent review of the record, we agree with the trial court that, under the totality of circumstances, defendant's confession was voluntary. True, before he confessed, defendant asked Inspector Falzon to promise that he would be placed in a separate cell. But Falzon never made such an express promise; rather, he explained to defendant that he and Inspector Clark did not "run the San Francisco City Jail," but that they would try to have him placed in a separate cell. More importantly, Inspector Falzon never told defendant that any effort to secure defendant a separate cell would be *contingent* on defendant's decision to give a statement. As to

defendant's claim that Inspector Clark threatened that defendant would not be placed in protective custody if he refused to make a statement, the trial court rejected that claim. That finding has ample support in Inspector Clark's testimony denying that he had made such a threat.

### D. Pretrial Publicity

Defendant asserts that adverse and prejudicial pretrial publicity, created in part by statements that San Francisco Police Inspector Frank Falzon gave to the media, denied him a fair trial.

On September 9, 1988, two months before the start of jury selection in defendant's case, a San Francisco television station broadcast a program entitled *Life After Death Row*. Appearing on the program was Inspector Falzon. The program's narrator explained that before 1972 defendant was convicted of murder and sentenced to death, that after his death sentence was invalidated by a court decision he was released on parole, and that shortly thereafter he was charged with killing store owner Naumoff. The narrator also mentioned that defendant had pleaded guilty to murdering Naumoff and had again been sentenced to death, but that because of a "legal loophole" the conviction was overturned. Inspector Falzon said during the broadcast that defendant had killed once before, had been paroled, and had killed again. He added that the prosecution had done nothing wrong in connection with defendant's initial conviction for killing Naumoff, that the taxpayers should not be "stuck" with the cost of a retrial, and that defendant had "learned how to beat the criminal system." Falzon played portions of defendant's tape-recorded confession. Also appearing on the program were defendant and his attorney, each of whom asserted defendant's innocence.

On the morning before the program was broadcast, columnist Herb Caen of the San Francisco Chronicle mentioned the upcoming telecast in his column. Caen wrote that defendant's conviction for killing Naumoff had been "reversed by [former Chief Justice] Rose Bird," and he quoted Inspector Falzon's statement, "This guy used to say he wanted to die. I hope he gets his wish."

In October 1988, a voter information pamphlet was distributed to all the voters in the State of California. On the ballot that November was Proposition 89, an initiative proposing to give the Governor of California the power to overturn decisions of the parole board. The argument in favor of the initiative mentioned that defendant was sentenced to death for murder in

1965, that his death sentence was overturned on appeal, that he was released on parole in 1978, and that he killed a "store clerk" in 1979.

On November 21, 1988, while jury selection was underway, an article entitled, *Jury Selection Begins in Retrial of Death Row Survivor*, appeared in another local newspaper, the San Francisco Examiner. The story mentioned defendant's 1965 conviction for murder, his release on parole, his arrest, conviction, and death sentence for killing San Francisco store owner Naumoff, and this court's reversal of defendant's conviction for the murder of Naumoff.

On three occasions, defendant asked the trial court to dismiss the charges against him, contending that the pretrial publicity made it impossible for him to have a fair trial, and that Inspector Falzon's statements to the news media constituted "prosecutorial misconduct" because they increased the likelihood that any jury selected to try his case would be tainted by prejudicial publicity. He also made a motion for a change of venue. The trial court denied the motions. Defendant now argues that even if the court properly denied his motions to dismiss the charges, it should at least have granted his less drastic request for a change of venue. We disagree.

 A trial court should grant a criminal defendant's motion for change of venue if "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a).) Among the factors to be considered are " 'the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and of course the nature and extent of the publicity.' " (*People* v. *Sanders* (1995) 11 Cal.4th 475, 505 [46 Cal.Rptr.2d 751, 905 P.2d 420].) A denial of a motion for change of venue will be upheld on appeal unless the record shows both that it was " 'reasonably likely [that] a fair trial could not be had at the time the motion was made,' " and that it was " 'reasonably likely a fair trial was not in fact had.' " (*People* v. *Dennis* (1998) 17 Cal.4th 468, 523 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

 The first factor—the nature and gravity of the offense—weighed in favor of a change of venue, as defendant was charged with a capital crime only a short time after his release on parole following a long sentence for murder. This factor, however, was not dispositive. (See, e.g., *People* v. *Dennis, supra*, 17 Cal.4th at p. 523; *People* v. *Williams, supra*, 16 Cal.4th at p. 655; *People* v. *Sanders, supra*, 11 Cal.4th at p. 506.) The second factor— the size of the community—weighed heavily against a change of venue, because San Francisco, where store owner Naumoff was killed, is a heavily

populated urban center. Also weighing against a change of venue were the third and fourth factors—the prominence of the defendant and the victim—for the record contains no evidence that here either defendant or the victim was widely known in the community.

With respect to the fifth and final factor—the nature and extent of the publicity—the media reports about the case contained highly prejudicial information: the death sentence that defendant received for the 1965 murder, and the death sentence, later reversed on appeal, that defendant initially received for killing store owner Naumoff. The record, however, contains no evidence that a substantial portion of the community was aware of these reports.

The responses given by the prospective jurors at voir dire provide further evidence that the pretrial publicity had no prejudicial effect on defendant's right to a trial by a fair and impartial jury. Two prospective jurors mentioned that they had seen the television program in question, and one recalled reading about defendant in the ballot pamphlet; all three were excused. Several prospective jurors recalled hearing about the killing when it first occurred in 1979, but none of them remembered anything about defendant or his prior criminal history. A few others had read columnist Herb Caen's statement in the San Francisco Chronicle that he had been subpoenaed to testify in connection with one of defendant's motions to dismiss the case because of pretrial publicity. (Caen did not mention defendant's record or the facts of the case.) An overwhelming majority of the prospective jurors questioned knew nothing about the case. Thus, the trial court correctly concluded that the pretrial publicity regarding defendant's case would not prevent a fair trial in San Francisco County.

E. *Jury Venire*

Defendant unsuccessfully moved to quash the panel of prospective jurors from which his jury was selected, asserting that Blacks, Hispanics, women, youths, prospective jurors with high school or less education, and blue collar workers were underrepresented on the panel, and that his jury was therefore not selected from a fair cross-section of the community. The motion was based on the records of motions in three other criminal cases that challenged jury selection procedures in San Francisco County (People v. White (Super. Ct. S.F. County, 1991, No. 117535), People v. Thompson (Super. Ct. S.F. County, 1991, No. 124613), and People v. Henderson (Super. Ct. S.F.

County, 1986, No. 109544))[6] and on brief testimony offered by Dr. Linda Meza, a psychologist involved with the National Jury Project. ■■■■ Abandoning most of these claims, defendant now argues that the trial court should have granted the motion on the ground that Blacks and Hispanics were underrepresented on his jury panel, in violation of the Sixth and Fourteenth Amendments to the federal Constitution and article I, section 16, of the California Constitution.

■■■■ "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [99 S.Ct. 664, 668, 58 L.Ed.2d 579].) Defendant satisfies the first of these requirements: our cases hold that both Blacks and Hispanics qualify as "distinctive" groups for purposes of the fair-cross-section requirement. (*People* v. *Bell* (1989) 49 Cal.3d 502, 526 [262 Cal.Rptr. 1, 778 P.2d 129] [Blacks]; *People* v. *Ramos, supra,* 15 Cal.4th at p. 1154 [Hispanics].) ■■■■ We need not determine, however, whether defendant has complied with the second requirement (showing that Blacks and/or Hispanics are underrepresented), because he has not met the third requirement: a showing that any underrepresentation is the result of systematic exclusion of the particular group in the jury selection process.

■■■■■■■ A defendant cannot establish a prima facie case of systematic exclusion of a distinctive group merely by presenting statistical evidence that the group is underrepresented in the jury pool, venire, or panel.[7] Rather, the defendant must show that the underrepresentation "is the result of an improper feature of the jury selection process." (*People* v. *Howard, supra,* 1 Cal.4th at p. 1160; see also *People* v. *Bell, supra,* 49 Cal.3d at pp. 528-529.) Here, defendant has presented no evidence describing the manner in which jury pools, venires, and panels were created in San Francisco in November 1988, when jury selection in his case began. True, the records of the three San Francisco Superior Court cases mentioned

---

[6]We take judicial notice of the files in these three cases.

[7]"The jury 'pool' is the master list of eligible jurors compiled for the year or shorter period from which persons will be summoned during the relevant period for possible jury service. A 'venire' is the group of prospective jurors summoned from that list and made available, after excuses and deferrals have been granted, for assignment to a 'panel.' A 'panel' is the group of jurors from that venire assigned to a court and from which a jury will be selected to try a particular case." (*People* v. *Bell, supra,* 49 Cal.3d at p. 520, fn. 3.)

above, which were considered by the trial court in this case, contained evidence describing the manner in which this process had occurred in previous years. But defendant has offered no evidence that the process operated in the same manner at the time of his trial. As a result, he has not shown that the jury selection process contained any "improper features." (*People* v. *Howard, supra,* 1 Cal.4th at p. 1160.)

### III. DISPOSITION

The judgment is affirmed.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.