Filed 9/28/16  P. v. Cavazos CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RONNIE JAVIER CAVAZOS,<br><br>        Defendant and Appellant. | F069276<br><br>(Super. Ct. No. 1407452)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Scott T. Steffen, Judge.

Philip M. Brooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted appellant Ronnie Javier Cavazos for the February 3, 2007, kidnapping/carjacking of Aurelia Pina (Pen. Code,[1] § 209.5 count III) and first degree robbery (§ 211; count IV), finding true he personally used a firearm (§ 12022.53, subd. (b)). He was also convicted for the February 16, 2007, first degree murder of Randeep Singh (§ 187; count I) and attempted robbery (§§ 664/211; count II). He personally and intentionally discharged a firearm causing Singh's death (§ 12022.53, subd. (d)).

Appellant received an indeterminate sentence of life without the possibility of parole for Singh's murder, plus an additional 25 years to life for the firearm. For the kidnapping/carjacking, a sentence of seven years to life was imposed, which was doubled pursuant to section 667, subdivision (d), and further enhanced by 10 years for the firearm. He received a determinate sentence of three years for Pina's first degree robbery, which was doubled pursuant to section 667, subdivision (d), and further enhanced by 10 years for the firearm. Regarding the attempted robbery in Singh's murder, he received a sentence of eight months, which was doubled pursuant to section 667, subdivision (d), and further enhanced by eight years four months for the firearm. That sentence was stayed.

Appellant's conviction was based largely upon the trial testimony of two brothers, David and Paul Gonzalez, who were accomplices in both crimes. Before trial, the brothers entered into testimonial agreements with the prosecution for negotiated sentences. On appeal, appellant contends their trial testimony was unreliable, violating his due process rights, and he further maintains their accomplice testimony was not sufficiently corroborated. He argues a magistrate improperly authorized certain warrants

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

in his case. Finally, he asserts his motion for new trial should have been granted based on alleged prosecutorial misconduct. We reject these contentions.

However, we agree with the parties that sentencing error occurred. The trial court improperly doubled appellant's sentences in counts II, III and IV pursuant to section 667, subdivision (d), because the prosecution had dismissed the allegations of a prior felony conviction pursuant to that section. We further note a clerical mistake appears in the determinate abstract of judgment. We remand for resentencing but otherwise affirm.

## FACTUAL BACKGROUND

**I.    Prosecution's Trial Evidence.**

**A.    The February 3, 2007, kidnapping/carjacking and robbery.**

On February 3, 2007, Aurelia Pina, a manager of a movie theater in Modesto, was driving home after locking the theater in the early morning hours. Her trip home ended when a truck and another car blocked her at a deserted intersection. Two men exited the truck. One of the men held a silver colored gun and wore a mask depicted in the movie *Scream*. The man with the Scream mask pointed the gun at her face, and the men entered her vehicle. She was driven away. The man wearing the Scream mask asked about the theater's safe. Upon hearing it had an auto lock and could not be opened, Pina was asked about her personal bank account. She was driven to her bank and the man in the Scream mask accessed her account from the ATM drive-thru. While waiting in the drive-thru, the second man exited Pina's vehicle. The man in the Scream mask withdrew $20 from her account. She was driven to a nearby residential area and left there. The men drove away in another car.

The bank's black and white video shows the driver of Pina's vehicle wearing a Scream mask and a light-colored sweatshirt which appears gray in color. A second car follows through the drive-thru, but that driver's face is not discernable.

3.

**B.      The February 16, 2007, murder and attempted robbery.**

In the early morning hours of February 16, 2007, Randeep Singh, a clerk at a Quik Stop in Salida, California, was shot after two people entered the store. Singh died as a result of a single gunshot from a .10-millimeter gun. In the store's surveillance video, one intruder wore a Scream mask and had a gun, and the other intruder wore a black ski mask. The man in the black ski mask had jumped over the counter and police later found a shoeprint on the counter. The two men left in a white truck. At a nearby Holiday Inn, police located the white truck, which had been abandoned with its motor running. Based on its condition, the truck appeared to have been stolen. Police reviewed video at the Holiday Inn and saw a second car involved with the truck.

**C.      Law enforcement focuses on appellant.**

Detective Philip Owen reviewed the Holiday Inn video. Based on prior surveillance of appellant, Owen was familiar with appellant's car, a Toyota Avalon. Owen believed the second car looked similar to appellant's Avalon. After viewing the video early in the morning of Singh's murder, Owen drove to appellant's known residence and observed the Avalon in appellant's driveway. Owen noticed appellant's Avalon did not have dew on its windows. All of the other cars in the neighborhood parked on the street had dew on the windows.

Law enforcement obtained warrants authorizing wiretaps of cell phones belonging to certain individuals, including appellant, David Gonzalez, and Paul Gonzalez. Phone calls were intercepted from late February through April 2007. At trial, the jury heard recordings of eight telephone calls. In some of those recordings, appellant cryptically told David he needed his gun, which David eventually said had been taken in a police raid. Appellant told David to look for a black trash bag in a bedroom at his parents' house, retrieve a small plastic bag inside and "take care of it" for him. Appellant told the mother of his children he wanted to say goodbye because he was not sure what was going

4.

to happen. Appellant expressed concern that "the car" and a trash bag with his clothes were going to get him in trouble.

In the home of appellant's parents, law enforcement located a plastic bag in a closet. The bag had a smaller bag inside, which contained ammunition and clothing, including a "gray zip-up style" sweatshirt.

### D. Officers locate the gun.

Police later retrieved a handgun from Cuauhtemoc "Memo" Marquez, who had purchased the gun from an acquaintance of David sometime after Singh's murder. Marquez did not know David and did not know the gun was used in a crime. Ballistics testing confirmed this .10-millimeter handgun fired the bullet that killed Singh.

### E. Paul's trial testimony.

Before trial, Paul entered into a testimonial agreement with the prosecution. The agreement originally required him to serve a juvenile term until he reached 25 years of age. He was 21 years of age at the time of appellant's trial and had been incarcerated continuously since April 2007.

### 1. Changes in Paul's testimonial agreement.

At trial, it was discovered that Paul's testimonial agreement had been modified without disclosure to either the defense or the court. Under the new agreement, Paul would be released four years earlier than originally agreed. The defense objected and a discussion in chambers occurred. The court informed the jury that Paul was receiving a reduced sentence for his testimony, the original agreement called for a juvenile term until he turned 25, he would now be released from custody shortly after appellant's trial, this new agreement was reached within the last two weeks, and the prosecutor had failed to inform either the defense or the court about the altered terms. The court admonished the jury to consider the effect, if any, of the prosecution's late disclosure when evaluating the weight and sufficiency of Paul's testimony.

**2.     February 3, 2007, kidnapping/carjacking and robbery.**

Paul told the jury he participated with appellant and David in Pina's kidnapping and carjacking on February 3, 2007. David stole a truck to use in that crime. Appellant had a plan to rob a movie theater and they waited in the parking lot until they saw a manager lock the doors and leave. They followed her in two vehicles as she drove. Paul rode with appellant in the stolen truck and David drove appellant's Avalon. Paul described the Avalon as a "fawn" or "tannish gold." Appellant had a gun.

At an intersection, appellant pulled the truck in front of Pina's vehicle. He wore a Scream mask and he pointed his gun at Pina's face while Paul got into the back of her vehicle. They drove her to her bank. At the ATM drive-thru, Paul left Pina's vehicle and he jumped into the Avalon with his brother. After the crime, appellant left Pina and joined them in the Avalon. At trial, Paul watched the video from the bank. He identified Pina's vehicle at the ATM drive-thru and then appellant's vehicle, which he said David was driving.

**3.     February 16, 2007, murder and attempted robbery.**

Paul was with appellant and David on February 16, 2007. They drove in appellant's Avalon to Foster Farms where David stole a white truck. After driving the truck away, David and appellant swapped vehicles. Appellant drove the stolen truck and David drove the Avalon. David handed appellant a silver or chrome colored handgun. Appellant and Paul drove to a store in Salida. They entered and appellant wore a Scream mask while Paul wore a black ski mask.

Once inside, the clerk ran at appellant swinging a push broom. Paul threw cigarette lighters at the clerk and appellant ran out of the store. Paul was behind the counter and he ran from the store. He saw appellant shoot Singh. They drove away in the stolen truck and met David nearby. Appellant said he "fuckin' shot him." They all drove away in the Avalon, stopping at a dumpster where Paul and appellant threw away

6.

some of their clothes and gloves. Paul could not remember what happened with appellant's gun.

At trial, Paul watched the store's video and he identified appellant as the intruder wearing the Scream mask. He said that person could not be David because David had a tattoo on the back of his neck, which was not visible on the intruder.

On cross-examination, Paul admitted he was sharing a cell with David during appellant's trial. Paul admitted he had read the police reports and had talked with David about his testimony. He denied that they had told each other what they would say. They both knew about the other's testimonial agreement.

**F.      David's trial testimony.**

Before trial, David entered into a testimonial agreement with the prosecution for a prison sentence of 19 years eight months. He was serving that sentence at the time of appellant's trial. He said he took the deal so Paul could get out.

David admitted his Norteño gang membership when these charged crimes were committed, but said he was no longer a member. He also admitted he was convicted for an auto theft and attempted robbery committed in 2002 with appellant and another individual. He and appellant both wore Scream masks when they committed the crimes in 2002.

**1.      The February 3, 2007, kidnapping/carjacking and robbery.**

David was with appellant and Paul on February 3, 2007. They left David's house to commit a robbery, driving appellant's Avalon. David stole a truck from a warehouse. They drove the two vehicles to a movie theater and discussed robbing it. A female, who appeared to be a manager, exited the theater after locking the doors. They decided to follow her, kidnap her, and bring her back to open the theater's safe. Appellant drove the stolen truck and Paul rode with appellant. David drove the Avalon.

Appellant wore a Scream mask and gloves, and he had a .10-millimeter Smith and Wesson handgun, which David had purchased from a cousin. David gave appellant the

7.

gun that night. At a deserted intersection, appellant pulled the stolen truck in front of Pina's vehicle, and David pulled the Avalon behind her bumper. Appellant threatened Pina with the gun. Paul got into the back of her vehicle and appellant drove them away. David followed them to a Bank of the West, and Pina's vehicle stopped at the ATM. Paul exited Pina's vehicle and joined David in the Avalon. Pina's vehicle pulled away and David followed them past the ATM. Appellant left Pina in her vehicle a few blocks away. They drove away in the Avalon.

David testified that appellant's Avalon had a cross hanging from its rearview mirror. At trial, he identified that cross in two police photographs of the Avalon. He also viewed the bank video, telling the jury that appellant was the driver of Pina's vehicle. He identified himself as the driver of the second car, which he said was appellant's Avalon.

### 2. February 16, 2007, murder and attempted robbery.

On February 16, 2007, David, appellant and Paul planned a robbery. They drove to Foster Farms and David stole a white truck. They later switched vehicles. Paul rode with appellant in the stolen truck and David followed in the Avalon. Appellant and Paul planned to commit several quick robberies, which David thought was a bad idea. Appellant and Paul stopped at a Quik Stop, and David parked at a nearby Holiday Inn. Paul had on a black sweater and ski mask, and appellant had on some type of sweater, gloves and the Scream mask. Appellant had the .10-millimeter gun.

David waited at the Holiday Inn for approximately five minutes before appellant and Paul joined him there, arriving in the white truck. Appellant said, "It's over," and he "shot him." David drove them to a supermarket and he saw Paul put things into a dumpster. David did not see appellant discard anything. They returned to David's residence. Paul told David that the clerk came out swinging a broom, he defended himself by throwing lighters, he jumped over the counter and ran out.

David watched the news the following day and learned that the clerk was dead. He asked appellant for the .10-millimeter handgun about a week later. David got it from

8.

appellant and sold it to an associate, who sold it to a third person. David did not tell appellant. David got rid of the gun because he knew it was "hot."

During trial, David listened to his intercepted phone conversation with appellant on March 7, 2007. Appellant told David to "pick up my baby" which David knew was the .10-millimeter gun. David told appellant there were no more bullets for it, which was a lie. He listened to another conversation recorded on March 14, 2007, when David told appellant the gun had been taken by police. David told the jury he lied because he did not want to tell appellant he sold the gun.

David observed the store's video. He told the jury the man in the Scream mask was appellant and the gun was the .10-millimeter which David gave appellant and which David later sold. David told the jury he could not be the person in the Scream mask because he has tattoos on his neck. David showed the jury his name "Gonzalez" tattooed above his shoulders on his neck, along with "209" and a star behind his left ear.

On cross-examination, David stated he and Paul were cellmates for approximately two and a half years before David went to prison, and they were again cellmates during appellant's trial. David denied that he and Paul discussed or talked about Paul's trial testimony. David admitted he had read the police reports and had discussed them with Paul. David said he did not want to testify at trial but felt he had to as part of his deal or he would face life without parole.

### G. Appellant models the gray sweatshirt for the jury.

During the trial, a detective was being cross-examined when defense counsel had appellant "model" the gray colored sweatshirt which police had seized from a closet in the home of appellant's parents. While appellant modeled this sweatshirt, several jurors asked him to strike various poses and manipulate the length of the sleeves on his arms. While appellant modeled the sweatshirt, the jurors asked to view a still photo from the bank's video, which was displayed for them.

9.

## II.     Relevant Defense Evidence.

According to appellant's father, Detective Owen threatened that it did not matter if appellant "did it" because Owen "was going to get him for it anyways."  Appellant's father said appellant always wore a big silver watch.  His father said appellant applied a product on his (dad's) windshield that kept away dew or morning condensation.

Appellant's mother testified she was present when Owen said he would do "whatever it takes" to keep appellant in jail "whether he's guilty or not."  She testified that appellant always wore a watch, and he used detailing products on their car windows.  She did not see any rain or dew on the windows.

## DISCUSSION

## I.     The Admission of David's Trial Testimony Did Not Violate Appellant's Constitutional Rights.

Appellant asserts the admission of David's trial testimony prejudicially violated his right to due process.  He contends his convictions must be reversed.

### A.     Background.

Before trial, appellant's defense counsel moved to exclude David's trial testimony as untrustworthy and unreliable as a result of alleged coercive interrogation techniques.  A hearing occurred under Evidence Code section 402.  The trial court heard testimony from both David and Dr. Richard Leo, the defense's expert on unreliable coerced confessions.  The court indicated it had reviewed all of David's interview.

#### 1.     David's interview with law enforcement.

On April 12, 2007, detectives interviewed David for approximately four hours following his arrest.  He was read his *Miranda*[2] rights and informed that Paul was in custody and Paul had told police everything.  David was told to be honest because police knew appellant had pulled the trigger.  David was told Paul would take the "whole rap" if

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

David was not honest, he was told to think about his kids, and he was warned several times this was a death penalty case. David denied any knowledge of the crime.

The eventual trial prosecutor entered the room, stating he had witnessed Paul's entire interview and Paul had "set himself up" for life in prison for premeditated murder during commission of a robbery with a gang enhancement. The prosecutor said he would not hesitate to prosecute Paul as an adult. David was urged to tell the truth because he was not law enforcement's target but was facing a capital murder charge as an aider and abettor. David continued to deny any knowledge, and he was told to think about his family, little brother and kids. The prosecutor said he would add a gang enhancement to David's charges, but said again that David was not the target. When David asked why he was not the target, the prosecutor said the video did not show David in the store involved in shooting the victim. A detective said David could be seen in the car and they knew he was the driver. David continued to deny any involvement or knowledge.

A detective said it was appellant who pulled the trigger and Paul was with appellant inside the store. David was told to help himself and his brother by giving an explanation about what happened. When David continued to deny any knowledge, a detective offered to bring Paul into the room. He was told this was a death penalty case and he would go to jail with appellant. He continued to deny any involvement, denied knowing the location of the murder weapon, and said the gun was not his. He was again told to tell the truth for his brother, and to think about his kids.

David was allowed briefly to see Paul, who stood in the open door in the hallway with another detective. Detectives played an unknown portion of Paul's interview for David, and they told David that Paul was willing to take the rap for everything if David did not talk. David said he did not want anything to happen to Paul. A detective summarized Paul's statements, saying appellant needed money, they stole a truck, and appellant shot the victim after the victim came at appellant with a stick. David agreed

11.

that happened, but he denied stealing a truck, denied planning anything, and said he would not say anything more. He was told Paul would take the rap for murder.

Paul was brought back into the room with David. Paul asked David if he was "scared" about the truck. In David's presence, detectives asked Paul if he told appellant to shoot the clerk when they entered the store. Paul denied doing that and agreed appellant shot the clerk on his own. Paul said he ran from the store. David was told Paul had been honest, all of the evidence showed appellant was the shooter, and David needed to be honest with them to help Paul. Detectives said appellant would likely blame Paul for the shooting and David's continued silence would hurt Paul. David said he did not want anything to happen to Paul, and he said he did not "plan it." The detectives took Paul from the room and David asked to use the restroom.

After the break, David said appellant wanted to get some money and appellant had an idea to steal a vehicle. They found a truck at Foster Farms, which appellant stole. David drove appellant's Avalon. Paul rode with appellant in the stolen truck. Appellant had a gun. David followed them, not wanting to commit a robbery but also not wanting to leave Paul. David saw them at a Quik Stop and he parked nearby. After the robbery, appellant drove to David's location, and they returned to David's house in the Avalon. Appellant told David he thought he shot a guy, who was swinging a broom at Paul. David denied that appellant ever said he wanted to kill the clerk before the robbery. David denied knowing the location of appellant's gun, which he said was black.

David was told law enforcement had monitored his cell phone for some time and they had his text messages. He was told enough circumstantial evidence existed to make this a death penalty case and he needed to cooperate about the gun's location. David said he gave a chrome gun to a friend named Juan Zamora less than a week after Singh's murder. David believed that Zamora then gave the gun to a man known as "Memo." He denied involvement in other robberies.

12.

The detective said David's cell phone was matched to the crime scene where Pina's carjacking occurred. David was told he had to cooperate to avoid a death penalty case. David admitted the crimes involving Pina, saying they stole a pickup truck. He drove appellant's Avalon and appellant drove the stolen truck. Appellant jumped into Pina's car while wearing a Halloween or Scream mask. They drove her to a Bank of the West.

### 2. David's testimonial agreement.

David's testimonial agreement called for him to do the following: (1) make full and complete disclosure of information concerning all robberies he participated in, including the one involving Singh; (2) make himself available for any additional interviews with law enforcement; (3) make himself available as a witness to these crimes; and (4) testify "fully, fairly and truthfully at all hearings, trials or retrials as necessary." In exchange, the prosecution was willing to permit David to enter guilty pleas to lesser-related offenses. The agreement further noted it would be the trial judge who would determine the truthfulness of David's testimony at the time of his sentencing and the actual result of appellant's trial would not affect David's plea agreement. The prosecution was not bound by the agreement if the above stated conditions were not met or if David testified falsely, in which case David could be additionally prosecuted for perjury.

### 3. Leo's testimony at the Evidence Code section 402 hearing.

Leo, a professor at the University of San Francisco School of Law, has training in the law and social sciences, and he is an expert on coercive interrogations. He had qualified as an expert in criminal cases around 240 times. He reviewed David's April 12, 2007, interview with law enforcement. Leo noted that law enforcement used evidence ploys with David, including a claim that his brother provided information and a claim that a video showed David's involvement. Law enforcement used repeated threats and promises with David, including threats of the death penalty and implied threats he would

13.

not see his children or his brother.  Law enforcement suggested to David it was appellant who had pulled the trigger, and implied promises of leniency were given to David if he said what law enforcement wanted to hear.  Leo concluded that David's interview was a "psychologically coercive interrogation."

### 4.    David's testimony at the Evidence Code section 402 hearing.

David understood the prosecution wanted him to testify at trial regarding Singh's murder, and Pina's carjacking and robbery.  He did not feel forced to testify, but said he was doing it so his "little brother" could go home.  He did not believe the prosecution wanted him to testify in a certain way, but to explain what happened.  However, he believed he could be recharged with life without parole, and Paul would not be set free, if he did not testify to certain facts.  He initially said it was the prosecutor who would judge his credibility, but then said he did not know whether it was the judge or the prosecutor who would determine if he was telling the truth.

On cross-examination, David said the prosecutor told him to tell the truth when testifying.  David denied that the prosecutor ever scripted his testimony.

On redirect examination, David said he did not want to talk during his April 12, 2007, police interview, but he felt he needed to say something when Paul was brought into the room.  He was told to either say something or Paul would "go down for this." David knew appellant was the target and police wanted him to say appellant was responsible.

The court directly asked David some questions.  David told the judge he felt his testimony in court had to reflect what he said in the police interview.  He believed if he did not testify similarly, the prosecution would recharge him.  David agreed with the court that his statements at the end of his interview were true, and agreed he would be telling the truth if he testified consistently with the final part of that interview.

14.

### 5. The trial court's ruling at the Evidence Code section 402 hearing.

After hearing argument from counsel, the court stated it would not agree with Leo that the interrogation techniques were so coercive as to result in an involuntary statement. The court believed David's implication of appellant was not necessarily the product of coercion, noting law enforcement "certainly wore him down in a colloquial sense" but David's free will was not overcome. The court recognized the detectives used a "fairly heavy-handed" approach, but noted David said his statements were ultimately the truth, and his testimony in court would be the truth. The court ruled David could testify.

### B. Standard of review.

Defendants have limited standing to challenge a witness's trial testimony based on a claim of police coercion. (*People v. Williams* (2010) 49 Cal.4th 405, 452.) The defendant bears the burden to establish a witness's trial testimony was coerced or made unreliable by earlier coercion, and its admission would prevent a fair trial. (*Id.* at pp. 452-453.) It is difficult for a defendant to exclude a witness's trial testimony even if that witness's earlier statements were rendered unreliable by police coercion. (*Id.* at p. 453.) We independently review the entire record on appeal to determine whether a witness's testimony was coerced, causing an unfair trial for defendant. (*People v. Boyer* (2006) 38 Cal.4th 412, 444 (*Boyer*).)

### C. Analysis.

Appellant contends the trial court concluded David's testimony was coerced. He asserts *People v. Badgett* (1995) 10 Cal.4th 330 (*Badgett*) and *People v. Lee* (2002) 95 Cal.App.4th 772 (*Lee*) control and David's trial testimony should have been excluded. We disagree.

### 1. David's statements to the detectives were not coerced.

Contrary to appellant's assertion on appeal, the trial court never concluded or found that David's statements to the detectives were coerced or involuntary. Instead, the

court determined the detectives never overcame David's free will. We agree with the trial court.

In the context of a defendant's confession, courts examine the totality of the circumstances, including the defendant's characteristics and the interrogation's details, to determine whether any confession was voluntary. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 (*Bustamonte*); *People v. Massie* (1998) 19 Cal.4th 550, 576 (*Massie*).) Regarding the defendant, the court takes into account his or her age, level of education, level of intelligence, physical condition, mental health, and whether he or she received advice regarding constitutional rights. (*Bustamonte, supra,* 412 U.S. at p. 226; *Massie, supra,* 19 Cal.4th at p. 576.) Regarding the interrogation, the court examines its location, its duration, whether questioning was repeated and prolonged, and whether any physical punishment occurred. (*Bustamonte, supra,* 412 U.S. at p. 226; *Massie, supra,* 19 Cal.4th at p. 576.)

Once a proper advisement of constitutional rights is given, a defendant may be freely questioned so long as threats of harm or false promises of benefits are not given. (*People v. Carrington* (2009) 47 Cal.4th 145, 170.) Law enforcement may exchange information with the defendant, summarize evidence, outline a theory of events, confront the defendant with contradictory facts, and enter into a debate. However, the defendant can neither receive threats of punishment for a failure to admit or confess particular facts, nor receive false promises of leniency as a reward for any admission or confession. (*Ibid.*) The prosecution bears the burden to establish by a preponderance of the evidence that a defendant's confession was voluntary. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) A confession may be deemed involuntary when it was the result of threats, violence, direct or implied promises, or improper influence. A statement is deemed involuntary if the defendant lacked free will or a rational intellect. (*Ibid.*)

Here, David was advised of his constitutional rights. The detectives confronted him with the known facts following Paul's statements and their review of the videos.

16.

David was correctly informed he faced prosecution for Singh's murder, this was a potential death penalty case, and Paul faced possible prosecution as an adult. David repeatedly denied any knowledge of the shooting.

After David was briefly allowed to see Paul in the doorway, David said he did not want anything to happen to Paul. A detective summarized Paul's statements, saying appellant shot the victim after the victim came at him with a stick. David agreed that happened, but then refused to provide further details. David's actions do not demonstrate a person incapable of resisting. To the contrary, David continued to demonstrate an ability to calculate what information he would disclose or withhold.

Moreover, David did not confess until after Paul was brought back into the room. In David's presence, Paul spoke with the detectives about the shooting. The detectives told David all of the evidence pointed to appellant as the shooter but David needed to help his brother by filling in the gaps. When Paul left, David went to the restroom and, upon David's return, he began to explain his role in the murder.

Although the detectives told David the seriousness of what he and Paul faced, the detectives never threatened David with punishment for a failure to admit or confess particular facts, and he was not given false promises of leniency. This record suggests David's confession was prompted more by Paul's admissions than the detectives' statements. Based on the totality of the circumstances, this record does not demonstrate that David's statements were coerced or involuntary.

### 2. David's trial testimony did not violate appellant's right to a fair trial.

It is not improperly coercive for a prosecutor to grant immunity to a lesser participant of a crime in return for that witness's promise to testify fully and truthfully about the facts. (*Boyer, supra*, 38 Cal.4th at p. 445.) However, such trial testimony is unreliable and inadmissible if the immunity agreement places the witness under a strong compulsion to testify in a particular fashion. It is improper for the agreement to require

17.

the witness to not materially or substantially change his or her testimony from the statements previously given to law enforcement. On the other hand, such testimony is proper when the testimonial agreement suggests the prosecution believed the prior statements were the truth, and the witness understood that his or her sole obligation was to testify fully and fairly. (*Id.* at p. 455.) This is so even when the witness is legally deemed an accomplice. (*People v. Avila* (2006) 38 Cal.4th 491, 594; see § 1111.)

Our Supreme Court's opinion in *People v. Fields* (1983) 35 Cal.3d 329 (*Fields*) is instructive. In *Fields*, the defendant's sister, Gail, entered into a plea agreement under which she agreed to testify "as to the truth" of certain events in exchange for her plea of guilty to being an accessory to murder. (*Id*. at pp. 359-360.) In response to questions by defense counsel, Gail stated she agreed to testify in accord with her last statement to the police, but in response to the district attorney's questions, she stated that she had agreed only to tell the truth. (*Ibid*.) The *Fields* court noted that Gail's statements concerning the terms of the plea agreement were not necessarily inconsistent. *Fields* held these statements were insufficient to demonstrate either that the plea bargain required her to testify in conformance with her earlier statement to police or that she believed that was the requirement. (*Id*. at pp. 360-361.) A witness such as Gail is under some compulsion to testify consistently with the earlier statements given to police. The prosecutor believed her last statement was truthful, and if she deviated materially from it she could be in breach and be prosecuted as a principal to murder. Despite this element of compulsion, *Fields* held a testimonial agreement is valid if it only requires the witness to testify fully and truthfully. Due process is met if the agreement allows the witness to testify freely at trial and to respond to any claim that a breach occurred by showing the given trial testimony was complete and true. (*Id.* at p. 361.)

Here, David's anticipated trial testimony was not subject to exclusion because no earlier coercion occurred to impair its reliability. Even if earlier coercion had occurred, David's testimonial agreement did not require him to testify in a particular way. Despite

18.

the compulsion David felt to not deviate materially from his previous statements to the detectives, David's testimonial agreement met appellant's due process rights because it allowed David to testify freely at trial. The defense had a full and fair opportunity, with knowledge of the terms of the testimonial agreement, to impeach David's testimony and to argue his credibility to the jury.

Appellant's reliance on *Badgett, supra,* 10 Cal.4th 330, is misplaced. In *Badgett,* the defendants were tried for murder. The primary prosecution witness was the 17-year-old girlfriend of one of the defendants. She testified her boyfriend admitted killing the victim. (*Id*. at pp. 339-340.) The girlfriend's mother was advised that her daughter would be released from custody if she cooperated with the police. (*Id*. at p. 354.) The mother conveyed this promise to her daughter, who then provided a statement to police implicating the defendants. Subsequently, the girlfriend was given formal immunity and testified pursuant to the immunity agreement. (*Id*. at p. 340.) The defendants argued the girlfriend's statements to police "were involuntary because they were the product of a promise of leniency." (*Id*. at p. 354.)

The *Badgett* court disagreed. An offer of leniency in return for a witness's cooperation with police does not render that third party's statements involuntary or trial testimony coerced. Instead, trial testimony given under a testimonial agreement does not violate the defendant's right to a fair trial if the agreement requires the witness to testify fully and fairly. (*Badgett, supra*, 10 Cal.4th at pp. 354-355.)

Here, David's testimonial agreement was conditioned on him testifying "fully, fairly and truthfully" at all hearings or trials. David's trial testimony given under the terms of this immunity agreement did not violate appellant's right to a fair trial. (*Badgett, supra*, 10 Cal.4th at pp. 354-355.) *Badgett* does not dictate reversal.

We are also unpersuaded by appellant's reliance on *Lee, supra,* 95 Cal.App.4th 772. In *Lee,* the court held a third party witness's statement was coerced because the police threatened to charge the witness with the crime at issue if he did not name the

defendant as the shooter. (*Id.* at pp. 785-786.) The officer gave the witness a polygraph test and told the witness he was using " 'high tech stuff' " a " 'computerized polygraph system' " which was " 'state of the art' " and accurate as a calculator. (*Id.* at p. 782.) The officer asked the witness if he had shot the victim and if he knew who the shooter was, and the witness answered both in the negative. (*Ibid.*) The witness was told the polygraph machine was " 'copyrighted by [the] Johns Hopkins University applied physics laboratory—the same people that monitor the spacecraft when they go out and come back in.' " The officer said the machine showed a 97 percent probability the witness was the shooter, and the witness was threatened with charges of first degree murder unless he named the defendant as the killer. (*Id.* at p. 783.) The officer threatened (without any apparent truth) that other people knew this witness was the shooter. (*Ibid.*) The witness implicated the defendant, saying the defendant was the shooter. (*Id.* at p. 785.) The next day, however, the witness recanted his statement and testified at trial that he did not see who shot the victim. (*Id.* at p. 776.) At trial, the prosecution was allowed to play a tape recording of the witness's statement against the defendant. (*Ibid.*)

On appeal, the *Lee* court found that the officer's statements were improper because the witness was threatened with prosecution for first degree murder unless he named the defendant as the shooter. (*Lee, supra*, 95 Cal.App.4th at p. 785.) *Lee* noted the witness was never read his rights under *Miranda*, which indicated he was not the real target of the investigation. (*Lee*, at p. 786.) The interrogation was not designed for truth but to create evidence to support the police's preconceived version of events. (*Ibid.*)

Here, unlike in *Lee*, David was read his constitutional rights at the start of the interview, the detectives did not lie about the state of the evidence, he was not confronted with a false polygraph test, and he never recanted his statements to the detectives. David's demeanor during the interview established he was in control of what information he would provide law enforcement. *Lee* is factually distinguishable.

20.

Appellant has not demonstrated how earlier alleged coercion directly impaired the free and voluntary nature of David's anticipated trial testimony and impaired the reliability of his actual trial testimony. Based on the whole record, David's trial testimony was not subject to exclusion. Appellant has not shown he was denied due process and a fair trial.

### 3. Appellant did not suffer prejudice.

Even when we presume David's trial testimony should have been excluded, its admission was not prejudicial. As discussed below in section II, Paul's trial testimony was properly admitted. Paul's testimony established that appellant shot Singh, appellant attempted to rob the Quik Stop, appellant carjacked Pina, and appellant robbed Pina. In light of Paul's testimony, David's trial testimony was unimportant in relation to everything else the jury considered in convicting appellant. (*Yates v. Evatt* (1991) 500 U.S. 391, 403, disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.) It is beyond a reasonable doubt that admission of David's trial testimony was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## II. Paul's Trial Testimony Did Not Violate Appellant's Due Process Rights.

Appellant contends his right to due process was violated when the prosecution was permitted to introduce Paul's trial testimony despite failing to disclose to the court or the defense that Paul's testimonial agreement had been modified.

### A. Background.

### 1. Paul's interview with law enforcement.

On April 12, 2007, police interviewed Paul following his arrest. He was 15 years old at the time. He was given his *Miranda* rights and detectives told him they were already talking with appellant and David. The detectives indicated they knew everything. Paul was told police had his shoeprint from the countertop, they could measure the width of his eyes through the mask in the video footage, and he left his DNA everywhere.

21.

Paul quickly began to confess. He said he rode with appellant in a stolen truck and his brother drove appellant's car. He ran into the store with appellant and a guy came at them swinging a big broom. Paul jumped behind the counter and he threw things at the man. Appellant fired his gun at the man and they left, going around the corner to get a ride with David. David picked them up at a Holiday Inn. Paul could not recall if appellant told David that he shot the man. He could not recall who stole the truck. He did not know what appellant did with the gun, but he and appellant threw their masks and gloves in a dumpster that night. He denied being with David and appellant for any other robberies.

### 2. Paul's Evidence Code section 402 hearing.

Paul's original testimonial agreement was identical to David's except he was permitted to enter guilty pleas to lesser-related offenses resulting in his imprisonment until his 25th birthday. At trial, defense counsel objected and sought a hearing pursuant to Evidence Code section 402 once it was learned Paul's testimonial agreement had been modified and he would be released four years earlier.

At the Evidence Code section 402 hearing, Paul said he had been sharing a cell with David over the last week and a half during appellant's trial. Prior to that, they had shared a cell for approximately two and a half years. Paul admitted he had discussed these crimes with David, they had both read the police reports, and they had discussed Paul's testimony. He admitted he was afraid he would not be released from custody and would be convicted of murder.

Paul stated he had discussed his testimony "a little bit" with David when they were together over the last week and a half. Paul was worried that he would not receive the deal if the jury thought he was lying. Paul agreed he believed his chances of being released depended on whether he said something different from David's testimony, and he agreed he thought it was important to testify the same as David. Paul also said he was required to "tell the truth" in order to receive an earlier release date.

22.

Paul learned from his lawyer about two months before that he might get a new deal with the prosecution. He was told he had to tell the truth to get the new deal. He denied ever suggesting he would not testify unless he received an earlier release date. The new agreement was reached approximately two weeks before appellant's trial started and it permitted his release following the conclusion of appellant's trial. Paul agreed with defense counsel that he might not be released early if the jury did not believe him. However, on cross-examination he agreed with the prosecutor that he was only required to tell the truth, and he would still be released if the jury did not convict appellant.

On cross-examination, Paul indicated he was still pleading guilty to the same charges contained in the original testimonial agreement, and the prosecutor told him he had to tell the truth. He agreed he would be released regardless of whether the jury convicted appellant or not, he understood he only had to tell the truth when testifying, and he agreed it did not matter if the jury believed him or not. He denied conspiring with David to lie when testifying, and he agreed he had discussed with David about telling the truth.

### 3. The trial court's ruling.

After hearing argument from counsel, the trial court noted the defense expert, Leo, had not contended Paul's original statements to the detectives had been coerced. In the interim, Paul signed the testimonial agreement, which resulted in incarceration until he was 25 years old and removed the death penalty from consideration. The court was uncertain why the prosecutor would improve the deal, but the court did not believe that was sufficient to establish coercion. The court determined it would allow Paul to testify, stating the testimonial agreement had not been materially changed. Although Paul would get out sooner, "the big break" was the first testimonial agreement, and the court noted it would determine at some point whether Paul told the truth.

23.

### B. Analysis.

Appellant asserts that Paul's new deal resulted in constitutionally unreliable trial testimony. He maintains Paul was under extreme pressure to testify similarly to his previous statements and to match David's trial testimony in order to receive his earlier release date. He contends his convictions must be reversed. We disagree.[3]

### 1. Paul's admissions to the detectives were not coerced.

When interviewing a suspect, police may use deceptive tactics, including lies, but a reviewing court will consider the impact of those tactics in determining the voluntariness of an ensuing confession. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240-1241.) A suspect's statements are not deemed involuntary when the deception is not reasonably likely to procure an untrue statement. (*People v. Farnam* (2002) 28 Cal.4th 107, 182 [fabricated evidence of fingerprints on a wallet alone not of type reasonably likely to procure an untrue confession]; *People v. Thompson* (1990) 50 Cal.3d 134, 166-167 [officers repeatedly lied, insisting they had forensic evidence linking the suspect to a homicide]; *In re Walker* (1974) 10 Cal.3d 764, 777 [confession found voluntary where a wounded defendant was told, perhaps deceptively, he might die before reaching the hospital and he should talk to close the record].)

Here, Paul was advised of his constitutional rights. The detectives behaved professionally with him. Although the detectives told Paul several lies, including that they had his shoeprint from the store's counter and could measure his eyes under his

---

[3] On September 13, 2016, respondent filed a letter and declaration from counsel indicating "several pages of its analysis in argument II were deleted from the filed copy [of its response brief]." Via the letter, respondent submitted the missing portions of its response to argument II, and requested that its untimely points and authorities be considered in resolving the instant matter. At oral argument on September 15, 2016, appellant requested an opportunity to file supplemental briefing if we considered respondent's untimely analysis. In resolving the present matter, however, we did not consider the points and authorities set forth in the September 13, 2016, letter. We deny respondent's request to consider them.

mask in the store's video, these deceptions were not of a type reasonably likely to procure untrue statements. The detectives did not belabor these deceptions before Paul began to confess.

We are mindful the law requires " 'special care' " when scrutinizing a record to determine whether a juvenile's confession was voluntary. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1166-1167, quoting *Haley v. Ohio* (1948) 332 U.S. 596, 599.) However, the law also requires an approach that looks at the totality of the circumstances. (*People v. Lessie, supra*, at p. 1167.) Under the totality of the circumstances, Paul's statements were neither involuntary nor coerced.

### 2. Paul's trial testimony did not violate appellant's right to a fair trial.

Paul's anticipated trial testimony was not subject to exclusion because no earlier coercion occurred to impair its reliability. Moreover, his testimonial agreement did not require him to testify in a particular way. Appellant's due process rights were met because Paul's testimonial agreement allowed him to testify freely at trial and to respond to any claim that a breach occurred by showing the given trial testimony was complete and true. (*Fields, supra,* 35 Cal.3d at p. 361.)

Although it is unclear why the prosecution altered the terms of Paul's testimonial agreement, the court admonished the jury to consider the effect, if any, of the late disclosure when evaluating the weight and sufficiency of Paul's testimony. In light of this admonishment, appellant's trial was not rendered fundamentally unfair. Further, the defense had a full and fair opportunity to impeach Paul's testimony and to argue his credibility to the jury, especially in light of the altered terms.

We further agree with the trial court that the approximate four-year reduction in Paul's sentence did not materially alter the nature of Paul's agreement. During the Evidence Code section 402 hearing, Paul indicated he was still pleading guilty to the same charges contained in the original testimonial agreement. He agreed he would be

25.

released regardless of whether the jury convicted appellant or not, he understood he only had to tell the truth when testifying, and he agreed it did not matter if the jury believed him or not. He denied conspiring with David to lie when testifying, and he agreed he had discussed with David about telling the truth.

Appellant has not demonstrated how earlier alleged coercion directly impaired the free and voluntary nature of Paul's anticipated trial testimony and impaired the reliability of his actual trial testimony. Based on the whole record, Paul's trial testimony was not subject to exclusion. Appellant has not shown that he was denied due process and a fair trial.

### III. A Neutral And Detached Magistrate Issued The Disputed Warrants.

Stanislaus County Superior Court Judge Loretta Begen issued certain warrants in this case during law enforcement's investigation. The disputed warrants authorized wiretaps of appellant's cell phone, a physical search of the residence of appellant's parents, and a search of appellant's Avalon. Appellant contends Judge Begen was not a neutral and detached magistrate. He asserts his convictions must be reversed because his Fourth Amendment rights were violated.

#### A. Background.

Before trial, appellant filed a motion to traverse, quash and suppress certain evidence which stemmed from the issuance of certain search and wiretap warrants which Judge Begen authorized. On June 28, 2011, a hearing occurred regarding appellant's motion. At the start of the hearing, the prosecutor stipulated to the following facts: (1) Judge Begen was married to Stanislaus County Chief Deputy District Attorney Jerry Begen; (2) Mr. Begen was the district attorney "on-call" at the time of the Singh murder; and (3) Mr. Begen was the district attorney's representative in charge of the investigation at that particular time.

26.

### 1. Detective Owen's testimony at the hearing to suppress.

At the hearing, Detective Owen testified regarding the warrants. He was one of the primary investigating officers at the Singh murder on February 16, 2007. On the night of the Singh murder, Owen came into contact with Mr. Begen at the crime scene for approximately 20 minutes. Owen had "one or two" additional contacts with Mr. Begen at subsequent briefings. At no time did Mr. Begen give Owen any direction or instruction on how to conduct the police investigation. Owen could not recall if Mr. Begen ever told him which judge should hear a wiretap application. Based on statements and physical evidence, police determined wiretaps were needed. Police attempted to contact the presiding judge. On or about February 17, 2007, Owen went to Judge Begen's residence. Owen had an application to intercept telephone communications. Owen said Mr. Begen was probably home at that time.

During the hearing, the trial court interjected and noted that a list existed which designated the rotating wiretap judges. The parties stipulated that the judge could locate that list and take judicial notice.

### 2. The trial court's ruling.

On August 22, 2011, the court offered its tentative thoughts, stating it had discovered that Judge Begen had been the primary wiretap judge when she signed the wiretap application, and she was the "on-call judge" when she signed the first warrant. Based on this, the trial court did not believe forum shopping occurred. The trial court also did not believe Judge Begen was required to disqualify herself. There was no indication her husband might have been a material witness. The court noted that no action or proceeding was pending because no complaint had been filed. Mr. Begen's work for the district attorney's office did not make him a party so Judge Begen was not a spouse to a party. The court believed any appearance of impropriety did not require exclusion under the Fourth Amendment of the United States Constitution. The court found that the officers acted in good faith.

27.

On September 28, 2011, the trial court entered its final ruling, confirming its earlier findings. The court denied the motions to traverse and suppress.

## B. Standard of review.

In reviewing the ruling on a motion to suppress, we review the trial court's resolution of the facts under a deferential substantial-evidence standard. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364.) The trial court's ruling on applying the applicable law to the facts is a mixed question of law and fact subject to independent review. (*Ibid.*)

## C. Analysis.

Appellant asserts an objective viewer could reasonably harbor doubt whether Judge Begen was neutral and detached. He contends she should have disqualified herself from these proceedings. We disagree.

### 1. Judge Begen was neutral and detached.

The United States Constitution requires a search warrant to be issued by a neutral and detached magistrate. (*Coolidge v. New Hampshire* (1971) 403 U.S. 443, 453 (*Coolidge*).) In *Coolidge*, the Supreme Court held unconstitutional the search and seizure of a particular automobile because the warrant was issued by a state official who was both the chief investigator and prosecutor in the case. Because he was not neutral and detached, the search occurred as if no warrant existed. (*Ibid.*)

Under *Coolidge,* "in determining whether the magistrate is 'neutral and detached' for Fourth Amendment purposes, primary importance is placed on the objective external circumstances and how they could be expected to influence a magistrate's decision whether to issue a warrant and not on the subjective state of mind of the particular magistrate. [Citations.]" (*Grimes v. Superior Court of Madera County* (1981) 120 Cal.App.3d 582, 586.)

Here, based on statements and physical evidence, the police independently determined wiretaps were needed. This record does not demonstrate Mr. Begen was

28.

involved in the decision to obtain the warrants in this case or that he directed the police investigation. Police first attempted to contact the presiding judge. When police went to Judge Begen's residence, she was the primary wiretap judge. In following the locally established protocol, the officers' actions indicate a lack of forum shopping and a routine request for a magistrate to review the application. Although Mr. Begen was "probably" home when police made contact with Judge Begen, there is no evidence Mr. Begen had any involvement in that meeting. This record establishes that Judge Begen was neutral and detached. Appellant's constitutional rights were not violated.

### 2. Judge Begen was not required to disqualify herself.

Code of Civil Procedure section 170.1 mandates disqualification of a judge, in part, when he or she has personal knowledge of disputed evidentiary facts. Such knowledge is implied when the judge's spouse is likely to be a material witness in the proceeding. (Code Civ. Proc., § 170.1, subd. (a)(1)(A) & (B).) A judge shall also be disqualified when his or her spouse is a party to the proceeding (*id.* at subd. (a)(4)); when the judge's spouse is a lawyer in the proceeding (*id.* at subd. (a)(5)); or when a person might reasonably entertain a doubt when aware of the facts that the judge could be impartial. (*Id.* at subd. (a)(6)(iii).) "Proceeding" is defined as "the action, case, cause, motion, or special proceeding to be tried or heard by the judge." (Code Civ. Proc., § 170.5, subd. (f).)

Without citing any authority, appellant submits that a "proceeding" encompasses judicial consideration and approval of an application for a search warrant. However, we need not decide that issue. This record does not establish that Judge Begen had personal knowledge of disputed evidentiary facts or that Mr. Begen would likely be a material witness. The district attorney's office was not prosecuting appellant when Judge Begen signed the disputed warrants. As such, Mr. Begen was neither "a party" nor "a lawyer" in the proceeding.

Under these facts, a person would not reasonably entertain a doubt regarding Judge Begen's ability to be impartial. The trial court properly denied appellant's motion.[4] Accordingly, reversal is not required.

## IV. The Trial Court Properly Denied Appellant's Motion For New Trial.

After his convictions, appellant filed a motion for new trial arguing, in part, prosecutorial misconduct. He asserts his motion for new trial should have been granted and contends his convictions must be reversed.

### A. Background.

#### 1. Motions in limine.

During motions in limine, appellant moved to exclude any testimony from law enforcement officers regarding perceived similarities between appellant's Avalon with the vehicles seen in videos from the Bank of the West and the Holiday Inn. During the hearing, defense counsel sought an admonishment that Detective Owen could not tell the jury he had recognized appellant's Avalon from the surveillance videos. The prosecutor made an offer of proof that Owen knew a cross hung from the rearview mirror of appellant's Avalon, and Owen made his identification of appellant's vehicle, at least in part, from that cross. Defense counsel argued no cross was visible.

##### a. The trial court views the ATM video.

With both counsel present, the court viewed the February 3, 2007, video from the bank. The court noted the general "class characteristics" of appellant's alleged Avalon were visible, but the court could not see anything dangling from the rearview mirror. The

---

[4] Appellant also cites canons from the California Code of Judicial Conduct in an effort to establish Judge Begen's obligation to disqualify herself. However, while this code and its canons reflect a judicial consensus regarding appropriate behavior, it has no force of law or regulation. (*Doan v. Commission on Judicial Performance* (1995) 11 Cal.4th 294, 312.) Moreover, the canons which appellant cite are similar in language to the relevant statutes in the Code of Civil Procedure from which we have found no basis for disqualification of Judge Begen.

prosecutor agreed that nothing was visible in that video. Defense counsel asked if Owen would not be allowed to testify he saw a cross dangling from the mirror when he viewed the video. The trial court did not respond to that question and Owen was called to testify at the hearing.

### b. Detective Owen's testimony at the Evidence Code section 402 hearing.

Owen was one of the lead detectives investigating the crimes involving both Pina and Singh. He watched surveillance video from both the Holiday Inn and Quik Stop. Owen viewed the video at the Holiday Inn directly from their monitors. He believed the car in the Holiday Inn video was similar to appellant's Avalon. Owen was familiar with appellant's Avalon based on recent law enforcement surveillance of appellant. In viewing the Holiday Inn footage, Owen saw the same "class characteristics" in the suspect's vehicle as in appellant's Avalon based on the shaping of the windows, the taillights, and the vehicle's color. In viewing the bank's video, Owen said he saw a cross hanging from the mirror, and, based on other general characteristics, he believed the vehicle at the bank was appellant's Avalon. From previous surveillance photos, Owen had seen a cross hanging in appellant's Avalon. He had also confirmed appellant had a cross in his vehicle after speaking with the mother of appellant's children.

### c. The trial court's ruling.

The trial court stated that Owen saw appellant's Avalon at some point before and he was perhaps able to view slightly better video. The court determined Owen was entitled to say something like he was reminded of appellant's car or he thought it could be appellant's car. The court did not want Owen to testify conclusively that it was appellant's car, but it was "worth more than a hunch" it was his vehicle. After further discussion with defense counsel, the court indicated Owen could say something like he had a "great suspicion" it was appellant's car.

31.

### 2. Relevant trial evidence.

At trial, Owen testified he viewed the video and believed the vehicle might belong to appellant. Owen was never asked and he never testified at trial that he could see a cross in appellant's alleged car in the videos.

David testified appellant had a white "necklace cross" that hung in his car from the rearview mirror. Several photos were introduced into evidence showing appellant's Avalon. In those still photos, a white cross on a necklace was visible in the Avalon.

### 3. Relevant closing arguments.

At the start of closing arguments, the prosecutor noted that appellant could not be convicted based on David's and Paul's testimony alone but some slight supporting evidence was necessary because they were accomplices.[5] The prosecutor showed two pictures to the jury, arguing a cross could be seen dangling from the rearview mirror of appellant's Avalon. The prosecutor reminded the jury that David testified a cross was in appellant's car. The prosecutor played a portion of the bank video and argued the white cross was visible in the video. Later in the argument, the prosecutor again noted the jurors would see a hanging cross when they viewed the bank video.

Defense counsel argued to the jury that no dangling white cross was visible in the bank video.

On rebuttal, the prosecutor again invited the jurors to view the bank video to see for themselves that the white cross was there. He asked the jurors to "[p]ut a stop to that insanity right when you go into deliberations."

### 4. Motion for new trial.

In denying the motion for new trial, the court stated the following regarding the cross:

---

[5] We address in section V below the issue of whether the accomplice testimony was sufficiently corroborated.

"With respect to the cross, I understand the power of suggestion; but the jury was able to view the video and the still shots taken from the video for themselves and this isn't like an argument where [the prosecutor] was speculating on things not before the jury trying to come up with suppositions to explain particular evidence. I think the jury could have easily rejected that evidence if they had wished to or they could view the photos and determine for themselves whether or not they wanted to believed that cross was there."

## B.      Standard of review.

A trial court's ruling on a motion for new trial is reviewed for an abuse of discretion. An appellate court will not disturb the trial court's ruling without a clear and unmistakable showing of abuse. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.)

## C.      Analysis.

Appellant asserts misconduct occurred when the prosecutor argued appellant's Avalon could be identified in the bank video based on an alleged cross hanging from the rearview mirror. He argues the trial court issued a ruling that no cross was in the video, and no witness ever testified about a cross visible in that video. He also maintains the prosecutor disparaged defense counsel when saying it was insanity for the defense to claim no cross was visible. In the alternative, he contends his defense counsel rendered ineffective assistance if he forfeited this issue on appeal. We disagree.

### 1.      Appellant forfeited this issue on appeal.

A claim of prosecutorial misconduct will not be reviewed on appeal in the absence of an objection and request for admonishment in the trial court. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215.) In the absence of timely objection at trial and request for admonition, the issue is deemed forfeited unless an admonition would not have cured the harm. (*Ibid.*)

Here, appellant failed to object to the prosecutor's comments regarding the alleged cross in appellant's vehicle. An admonition could have cured any harm caused by the prosecutor's alleged misconduct. Accordingly, appellant is deemed to have forfeited this issue on appeal. In any event, we also reject appellant's claim on the merits.

33.

## 2.    The prosecutor did not commit misconduct.

Misconduct occurs when a prosecutor misstates the evidence. (*People v. Davis* (2005) 36 Cal.4th 510, 550.) However, a prosecutor has wide-ranging latitude to discuss the case in closing argument. (*People v. Panah* (2005) 35 Cal.4th 395, 463.) A prosecutor is permitted to fully state his views regarding what the evidence establishes and to urge whatever conclusions he deems proper. (*Ibid.*)

Due process is denied and the Fourteenth Amendment to the federal Constitution is violated when a prosecutor's conduct renders a criminal trial fundamentally unfair. (*People v. Morales* (2001) 25 Cal.4th 34, 44.) When a trial is not fundamentally unfair, prosecutorial misconduct under state law occurs when the prosecutor attempts to persuade the jury with deceptive or reprehensible methods. (*Ibid.*) During closing arguments, a prosecutor is permitted to discuss the evidence and comment on reasonable inferences drawn from the evidence. (*Ibid.*)

As an initial matter, appellant asserts the court issued a ruling that Owen could not testify a cross was visible in the bank video and the court made a finding no such cross existed in that video. However, appellant provides no citation to the record in which the trial court ruled Owen was prevented from testifying about the cross or that this factual issue could not be decided by the jury. Moreover, the court never stated the prosecutor violated any ruling. The court noted this was an evidentiary issue for the jurors to determine, and they could have rejected the prosecutor's arguments. The trial court's response at the motion for new trial makes it clear this issue was not foreclosed from the jury's consideration.

Trial evidence established that appellant had a white cross and necklace hanging in his Avalon, and Owen believed appellant's Avalon was involved in both crimes. During closing arguments, the prosecutor showed two pictures to the jury which showed a cross dangling from the rearview mirror of appellant's Avalon. The prosecutor asked the jury to view the bank video and argued the cross was visible.

34.

The prosecutor was permitted to discuss the evidence and argue his views. The jurors were able to view the evidence and decide for themselves. The jury could have rejected that evidence if they believed the cross was not visible in the bank video. The prosecutor's comments did not render this trial fundamentally unfair so as to deny due process. Deceptive or reprehensible methods were not used to persuade the jury.

We are also unpersuaded that misconduct occurred because the prosecutor asked the jurors to stop "that insanity" and view the video themselves. A prosecutor is not required to discuss a case in a detached or clinical way. (*People v. Tully* (2012) 54 Cal.4th 952, 1021.) A prosecutor may make vigorous arguments so long as the arguments are not inflammatory and principally designed to arouse the jury's passion or prejudice. (*Id*. at p. 1021.)

Our Supreme Court has repeatedly rejected claims of prosecutorial misconduct involving the use of epithets during closing arguments. (*People v. Tully, supra*, 54 Cal.4th at p. 1021; see, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1195 [no misconduct where prosecutor characterized crimes as " 'serial killing,' " and " 'terrorizing and killing' " people (italics omitted)]; *People v. Jones* (1998) 17 Cal.4th 279, 308-309 [no ineffective assistance of counsel for failure to object to prosecutor's characterization of defendant's crime as a "terrorist attack" and comparison of defendant to "[t]errorists"]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250-1251 [no misconduct where prosecutor referred to the defendant as a " 'perverted maniac' "].)

Here, the prosecutor did not disparage defense counsel or appellant. The prosecutor asked the jurors to view the surveillance video themselves and resolve the factual dispute. The prosecutor's request for the jurors to stop "that insanity" did not amount to an egregious pattern of conduct that rendered the trial fundamentally unfair.

Based on this record, prosecutorial misconduct did not occur.[6] A clear and unmistakable showing of abuse did not occur when the trial court denied the motion for new trial. Accordingly, we will not disturb the trial court's ruling on appeal.

## V. The Accomplice Testimony Was Sufficiently Corroborated.

Appellant maintains his convictions must be reversed because the accomplice testimony from David and Paul was not sufficiently corroborated.

### A. Standard of review.

A defendant cannot be convicted of a crime based upon an accomplice's testimony unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. (§ 1111; *People v. Nelson* (2011) 51 Cal.4th 198, 217.) Such corroboration may be slight but must tend to implicate the defendant apart from the accomplice's testimony. The jury's determination regarding corroboration is binding unless the corroborating evidence should not have been admitted or does not reasonably connect the defendant with the crime. (*People v. Nelson, supra,* 51 Cal.4th at p. 218.)

### B. Analysis.

Appellant asserts the evidence in this case was insufficient to connect him to the commission of these crimes. He argues the bank video is insufficient, renewing his claim that the trial court determined the cross was not visible in it. We disagree.

The driver of Pina's vehicle wore a sweatshirt which appears gray in the black and white video. During several intercepted phone calls, appellant expressed concern about a trash bag in the closet of his parents' home, saying it contained his clothing and would cause him trouble. Police located a trash bag in a closet in his parents' home which contained a gray colored sweatshirt. At trial, the jury observed appellant modeling the

---

[6] Because prosecutorial misconduct is not present, we reject appellant's final contention that his defense counsel rendered ineffective assistance in not objecting to the prosecutor's comments. "Failure to raise a meritless objection is not ineffective assistance of counsel. [Citation.]" (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

sweatshirt. At the jurors' request, appellant manipulated the sweatshirt while the jury also viewed a still photo from the bank video. The jury was free to determine whether this sweatshirt matched the one from the video.

Further, Owen testified he was familiar with appellant's Avalon and he believed the second car in the Holiday Inn video looked similar to appellant's Avalon. On the morning of Singh's murder, Owen drove to appellant's known residence and observed the Avalon in appellant's driveway. Owen observed that appellant's Avalon did not have dew on it while the neighboring cars parked on the street had dew on the windows. The jury was provided surveillance photos of appellant's Avalon, some of which depicted a white cross. The jury was able to view the video from both the Bank of the West and the Holiday Inn to determine whether appellant's Avalon was involved in both crimes.

We reject appellant's contention the trial court foreclosed the jury's ability to determine whether a cross was visible in appellant's alleged car in the video. It was the jury's role to decide the facts of the case. (CALCRIM No. 104.) With CALCRIM Nos. 335 and 708, the jury was instructed that other independent evidence apart from the testimony of David and Paul was necessary to convict. It was necessary for this independent evidence to tend to connect appellant to the commission of the crimes. We presume the jurors understood and followed the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

In rendering its verdicts, the jury determined the accomplice testimony was corroborated. This record establishes sufficient corroborating evidence based on appellant's recorded statements, the gray sweatshirt, Owen's testimony, and the jury's ability to view the videos firsthand and compare the video with photos of appellant's Avalon. The jury's determination is binding as this evidence was properly admitted and it tends to connect appellant to the commission of these crimes. Accordingly, appellant's convictions will not be reversed.

## VI. Appellant's Sentence Must Be Recalculated.

The parties agree, as do we, that error occurred at sentencing. In December of 2012, the trial court granted the prosecution's motion to strike the allegation that appellant had suffered a prior conviction pursuant to section 667, subdivisions (a) and (d). However, in April 2014, the trial court imposed the following relevant sentences. On count II, eight months in prison, which was doubled pursuant to section 667, subdivision (d). On count III, seven years to life, which was doubled pursuant to section 667, subdivision (d). Finally, on count IV, three years, which was doubled pursuant to section 667, subdivision (d).

Because the prior conviction allegation pursuant to section 667, subdivisions (a) and (d), had been dismissed, appellant's sentence must be amended to strike the additional prison time imposed pursuant to section 667.

## VII. The Abstract Of Judgment Contains A Clerical Mistake.

There is a clerical error in the determinate abstract of judgment regarding count IV. The trial court sentenced appellant to a 10-year enhancement pursuant to section 12022.53, subdivision (b), but the abstract of judgment reflects a sentence pursuant to section 12055.53, subdivision (b). A trial court's oral judgment controls and "[w]hen an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties." (*People v. Jones* (2012) 54 Cal.4th 1, 89.) Accordingly, upon resentencing, we order the determinate abstract of judgment corrected to conform to the actual sentence imposed on count IV.

## DISPOSITION

The sentences on counts II, III and IV are vacated and this matter is remanded. The trial court shall strike the sentences imposed pursuant to section 667, subdivisions (a) or (d), and resentence accordingly. We further order the determinate abstract of

judgment to be corrected to conform to the trial court's oral pronouncement of judgment as to count IV on a 10-year enhancement pursuant to section 12022.53, subdivision (b). The court shall prepare amended abstracts of judgment and forward them to the appropriate authorities. The judgment is otherwise affirmed.

_____

LEVY, Acting P.J.

WE CONCUR:

_____

KANE, J.

_____

POOCHIGIAN, J.

39.